**In re MONARCH CAPITAL
CORPORATION,
Debtor.**

**Bankruptcy No. 91–41379–JFQ.**

United States Bankruptcy Court,
D. Massachusetts.

Aug. 12, 1991.

**369**

Capital owes approximately $247 million secured by the capital stock of Monarch Life. The motion is supported by Susan K. Scott, the Acting Commissioner of Insurance for the Commonwealth of Massachusetts (the "Commissioner"), who has been appointed Temporary Receiver for Monarch Life.

Gary A. Barney, Arnold B. Tschirgi, Lander, Wyo., for Norma Louise Waddoups.

Robert Gargill, Choate, Hall & Stewart, Boston, Mass., for Harrison J. Goldin, trustee.

Peter Nils Baylor, Nutter, McClennen & Fish, Boston, Mass., for Susan K. Scott.

Guy B. Moss, Bingham Dana & Gould, Boston, Mass., for The "Bank Group".

William F. McCarthy, Ropes & Gray, Boston, Mass., for debtor.

## OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

Norma Louise Waddoups ("Norma Louise"), an incapacitated person acting through her parents as her guardians, moves for an order terminating the automatic stay and directing the transfer of a structured settlement annuity policy so that she and others may continue to receive payments under the policy issued by Monarch Life Insurance Company ("Monarch Life") and owned by its parent corporation, Monarch Capital Corporation ("Monarch Capital"). The parent corporation but not the life insurance subsidiary is a chapter 11 debtor in this court. The motion is opposed by the chapter 11 trustee, Harrison J. Goldin (the "Trustee"), and a group of eleven banks headed by Chase Manhattan Bank, N.A. (the "Bank Group") to whom Monarch

## I. FACTS

The affidavits of the parties disclose no disputed facts. On July 25, 1977, Norma Louise, who was then a young girl, sustained serious and permanent injuries when she became entangled in a continuous towel dispenser in the ladies rest room located within the terminal building of the Cortez City–County Airport, Cortez, Colorado. She and her parents brought suit in Colorado state court against the manufacturer, the city, and the county (the "Tort Defendants").

The parties eventually agreed upon a settlement which was memorialized in two documents, a Memorandum of Agreement dated July 27, 1984 and a Settlement Agreement and Release dated August 2, 1984. These agreements set forth a rather complex method of payment: (i) $8,000 per month, plus interest of 7% per annum compounded annually, payable for thirty years from September, 1984 to August, 2014; (ii) $1 million payable on September 20, 2024; (iii) $1,069 per month payable for eleven years, or the duration of the life of one George Buck, whichever is longer; and (iv) $118,500 payable in September, 1984. The payments of $8,000 plus interest per month were to be made as follows: Norman Waddoups (Norma Louise's father)—$500 per month; Josephine Vivian Waddoups (her mother)—$500 per month; the guardianship estate of Norma Louise—$3,025 per month; Arnold B. Tschirgi (Norma Louise's lawyer)—$2,390 per month; Gary A. Barney (another lawyer for Norma Louise)—$1,585 per month. The $1 million payment due on September 20, 2024 was to be paid as a memorial fund in the name of Norma Louise for a purpose to be designated later. The payments of $1,069 per month were to be paid to George Buck, who is apparently a relative.

In negotiating the settlement, counsel for Norma Louise had in mind its tax consequences. Counsel knew that under § 104(a)(2) of the Internal Revenue Code personal injury damages received "whether as lump sums or as periodic payments" are nontaxable to the recipient. The provision on periodic payments was added to the statute in 1982 in order to codify Rev.Rul. 79–220. The ruling conceded that income earned by a settlement annuity payable to a tort plaintiff and owned by the tort defendant or its liability insurer is not taxable to the plaintiff under any theory that the plaintiff constructively received a lump sum settlement and then invested the proceeds. The tort defendant or his liability insurer holding the annuity policy also has favorable tax consequences because although they receive income to the extent of earnings on the policy's single premium, they are entitled to an equivalent deduction when these earnings are paid to the tort plaintiff. *See* Winslow, *Tax Reform Preserves Structured Settlements*, Jan. 1987 *Taxes* 22, 23–25.

In the present case, the Tort Defendants and their liability insurance companies wished to relieve themselves of all future liability, even liability contingent upon failure of the insurance company issuing the annuity to make the payments. Consistent with this goal, they needed someone else to own the annuity. They therefore had to comply with § 130 of the Internal Revenue Code, enacted as part of the Periodic Payments Settlement Act of 1982, P.L. 97–473, which deals with the tax consequences of annuities issued in a settlement where the defendant and his liability insurer are released of all liability, absolute and contingent.

Section 130, quoted in full in the margin,[1] sets forth a number of restrictions. The third party "assignee" who assumes the tort defendant's obligation must use the annuity "to fund" the periodic payments.

1. Section 130 read in 1984 as follows:

(a) In general.

Any amount received for agreeing to a qualified assignment shall not be included in gross income to the extent that such amount does not exceed the aggregate cost of any qualified funding assets.

(b) Treatment of qualified funding asset.

In the case of any qualified funding asset—
(1) the basis of such asset shall be reduced by the amount excluded from gross income under subsection (a) by reason of the purchase of such asset, and
(2) any gain recognized on a disposition of such asset shall be treated as ordinary income.

(c) Qualified assignment.

For purposes of this section, the term "qualified assignment" means any assignment of a liability to make periodic payments as damages (whether by suit or agreement) on account of personal injury or sickness—
(1) if the assignee assumes such liability from a person who is a party to the suit or agreement, and
(2) if—
(A) such periodic payments are fixed and determinable as to amount and time of payment,
(B) such periodic payments cannot be accelerated, deferred, increased, or decreased by the recipient of such payments.
(C) the assignee does not provide to the recipient of such payments rights against the assignee which are greater than those of a general creditor.

(D) the assignee's obligation on account of the personal injuries or sickness is not greater than the obligation of the person who assigned the liability, and
(E) such periodic payments are excludable from the gross income of the recipient under section 104(a)(2) [26 U.S.C.S. § 104(a)(2) ].

(d) Qualified funding asset.

For purposes of this section, the term "qualified funding asset" means any annuity contract issued by a company licensed to do business as an insurance company under the laws of any State, or any obligation of the United States if—
(1) such annuity contract of obligation is used by the assignee to fund periodic payments under any qualified assignment,
(2) the periods of the payments under the annuity contract or obligation are reasonably related to the periodic payments under the qualified assignment, and the amount of any such payment under the contract or obligation does not exceed the periodic payment to which it relates,
(3) such annuity contract or obligation is designated by the taxpayer (in such manner as the Secretary shall by regulations prescribe) as being taken into account under this section with respect to such qualified assignment, and
(4) such annuity contract or obligation is purchased by the taxpayer not more than 60 days before the date of the qualified assignment and not later than 60 days after the date of such assignment.

Although the statute does not specify who is to be the policy owner, presumably the third party who assumes the obligation must be the owner in order for that party to use the policy to "fund" its assumed obligation. The statute also mandates that the assumed liability cannot be accelerated, increased, or decreased by the tort plaintiff. The tort plaintiff, moreover, must not have rights against the third party which are greater than those of a general creditor. If these and other requirements are met, the third party is treated as not receiving income to the extent of the cost of the annuity. Payments by the annuity issuer exceeding the cost of the annuity, which necessarily consist of income earned from the single premium paid, do constitute income to the third party. That income, however, is offset by the payments made to the tort plaintiff. *See* Winslow, *Tax Reform Preserves Structured Settlements, Taxes*, Jan. 1987, 22, 24.

Consistent with these tax and liability goals, the Memorandum of Agreement provides that the Tort Defendants "shall assign their obligations [except for the $118,-500 payment] ... to Monarch Capital Corporation." It calls for Monarch Capital to assume the obligations of the Tort Defendants and thereby effect their release from all obligations. It also states: "Monarch

Capital Corporation shall fund their [the Tort Defendants'] obligations once assumed by the purchases of annuities from Monarch Life Insurance Company which is rated A+XV by Best and Company."

The Settlement Agreement and Release contains the provisions set forth in the margin [2] concerning funding of the liability of the Tort Defendants (called "RELEASEES") to Norma Louise and her parents (called "RELEASORS").

Monarch Capital, the Tort Defendants and their liability insurers, and the parents of Norma Louise (acting individually and as her guardians) then executed a contract entitled "Qualified Assignment and Consent" under which Monarch Capital (the "Assignee") was assigned and assumed the settlement obligations owed to Norma Louise and the others (the "Obligees"), and the Tort Defendants and their liability insurers were released of all their obligations. This document includes the following provisions:

3. The payments called for under the Settlement Agreement and Release cannot be accelerated, deferred, increased or decreased. Obligees have no right against Assignee greater than those of a general creditor. Assignee's obligation

---

2.

### VII.
The parties hereto acknowledge and agree that RELEASEES may make a "qualified assignment" within the meaning of Section 130(c) of the Internal Revenue Code of 1954, as amended, of RELEASEES' liability to make the periodic payments required herein. Any such assignment, if made, shall be accepted by RELEASORS without right of rejection and shall completely release and discharge RELEASEES from such obligations hereunder as are assigned to the assignee. RELEASORS realize that, in the event of such assignment, the assignee shall be their sole obligor with respect to the obligations assigned, and that all other releases that pertain to the liability of RELEASEES shall thereupon become final, irrevocable and absolute.
If the liability to make the periodic payments is assigned by way of a "qualified assignment":
1. The periodic payments from the assignee cannot be accelerated, increased, or decreased by RELEASORS;
2. The assignee does not provide to the RELEASORS rights against the assignee that

are greater than those of a general creditor; and,
3. The assignee's obligation for payment of the periodic payments is no greater than the obligation of the person originally liable (whether by suit or agreement) for payment and from whom the obligation was assigned.
### VIII.
RELEASEES, and/or the assignee shall fund their liability to make periodic payments through the purchase of an annuity policy (or policies) from MONARCH LIFE INSURANCE COMPANY, and represent that such company is an A plus life insurance company. RELEASEES and/or the assignee shall be the owner of the annuity policy (or policies) and shall have all rights of ownership. RELEASEES and/or the assignee may have the annuity carrier, MONARCH LIFE INSURANCE COMPANY, mail payments directly to RELEASORS or to RELEASORS' in care of their attorneys. RELEASORS and their attorneys shall be responsible for maintaining the currency of the proper mailing address and mortality information to MONARCH LIFE INSURANCE COMPANY.

to Obligees on account of the assignment and assumption effected hereby is no greater than Assignors' obligation immediately preceding this assignment and assumption. Obligees may not anticipate, sell, assign or encumber any of said payments, and said payments shall not be subject to:

(a) Execution or other legal process for any obligation of Obligees; or,

(b) The claims of creditors of the Obligees.

4. Although Obligees are and shall be only a general creditor of Assignee, Assignee will fund the liabilities it assumes hereby by purchasing a "qualified funding asset" within the meaning of Code Section 130(d).

Any such "qualified funding asset" shall be the sole property of Assignee; Obligees shall have no right or interest therein. The "qualified funding asset" shall be an annuity policy from Monarch Life Insurance Company of Springfield, Massachusetts.

5. This Qualified Assignment and Consent shall become null and void if:

(a) Obligees bring any action to set aside the Settlement Agreement and Release; or

(b) The Settlement Agreement and Release is found by a Court of law to be null and void.

6. If this Qualified Assignment and Consent Agreement becomes null and void, Assignee shall assign to Assignors its ownership in any "qualified funding asset" purchased pursuant to Paragraph 4.

\* \* \* \* \* \*

8. This Qualified Assignment and Consent shall be interpreted pursuant to the laws of the State of Colorado.

Monarch Capital signed, as applicant, an application with Monarch Life for an annuity policy providing for the thirty year payments of $8,000 plus interest per month, the eleven year payments of $1,069 per month, and the $1,000,000 payment due September 20, 2024. The application contains a paragraph entitled "Direction of Payments" which provides that: (i) the thirty year payments of $8,000 plus interest per month are to be paid in the agreed portions "to" the guardianship estate of Norma Louise and "to" her mother, her father and the two attorneys, (ii) the $1,000,000 payment is to be "paid to" Norma Louise's parents, and (iii) the eleven year payments of $1,069 per month are to be "paid to" George R. Buck. Mailing addresses of all these named payees are furnished. Upon the death of any named payee prior to completion of payments, beneficiaries are named to receive the balance of the payee's payments.

The Tort Defendants and their liability insurance companies paid a single premium of $1,406,367 directly to Monarch Life. They also paid Monarch Capital a fee of $1,653.18 for performing its function in acting as applicant for the policy and in assuming the obligations of the Tort Defendants. Monarch Capital's sole involvement consisted of executing the application and executing the Qualified Assignment and Consent. Both Monarch Capital and Monarch Life have their home offices in Springfield, Massachusetts.

Under date of August 3, 1984, Monarch Life issued an annuity policy (# 494818) pursuant to the application signed by Monarch Capital. The policy states: "This policy is a contract between its owner and us ... The entire contract consists of the policy, the application, a copy of which is attached, and any attached endorsements." There is no attached endorsement. The applicant is designated as "owner." Neither the policy nor the application contains a provision permitting the owner to surrender the policy, to obtain its cash value, to change the method of payment, or to change the original named payees. The policy permits the owner to "transfer ownership of the policy" or "assign this policy ... for a loan or other obligation." It states that "[w]e will pay income to the owner during your lifetime." The policy allows the owner to reserve the right to change the person (called the "beneficiary") designated to receive the payments of any original payee who dies. In the absence of such a reservation, the owner

and the "primary beneficiary must act together to use the rights and options under this policy as long as there are any death proceeds." Monarch Capital did not reserve the right to change the beneficiaries.

Monarch Life has made all payments under the policy directly to the named payees. These payments included an income element, which is in accordance with the special designations contained in the application but contrary to the general provision contained in the policy's printed form stating "[w]e will pay income to the owner during your lifetime."

Monarch Capital has recently experienced severe financial problems apparently stemming from poor real estate investments. It allegedly owes Monarch Life and other subsidiaries over $70 million as the result of intercompany transfers. In default under its loan agreement with the Bank Group, it engaged in lengthy negotiations with the Bank Group which culminated in a proposed restructuring of the Bank Group's loan. The proposed restructuring involved foreclosure on the pledge of Monarch Life's stock, recasting of the remaining debt, and organization of a new life insurance entity which would be owned in part by the Bank Group and in part by an investor group, Private Capital Partners, Inc. The investment group agreed to provide both capital and experienced insurance management. On May 31, 1991, when the negotiations between the Bank Group and Monarch Capital were in their final stages, the Bank Group and the investor group reduced their agreement to writing.

On May 30th, the Commissioner filed a verified complaint with the Supreme Judicial Court of Massachusetts seeking appointment of the Commissioner as Temporary Receiver of Monarch Life. The complaint alleged that Monarch Life was in a weakened financial condition as the result of debts owed it by Monarch Capital and commitments made to Monarch Capital's creditors. It also alleged that a foreclosure by the Bank Group on the stock of Monarch Life appeared imminent. In the absence of objection from Monarch Life, the Supreme Judicial Court immediately granted the requested relief. The Commissioner then joined in a petition filed in this court seeking an order against Monarch Capital for relief under chapter 11. An order of relief was thereafter entered, with the consent of Monarch Capital. On the motion of Monarch Capital, I have authorized the appointment of a trustee.

On June 19, 1991, Norma Louise's parents, individually and as her guardians, filed a complaint against the Tort Defendants in Colorado state court requesting an order setting aside the Settlement Agreement and Release. The complaint was filed to take advantage of paragraphs 5 and 6 of the Qualified Assignment and Consent which provide that upon the filing of such a suit the Qualified Assignment and Consent shall become null and void and Monarch Capital is to assign to the Tort Defendants and their liability insurers its ownership of the annuity. Based upon the frank admission made by Norma Louise's lawyer during oral argument, the financial condition of Monarch Capital was the sole reason for filing the complaint.

Disposition of the present motion can have consequences for other similarly held annuities. Monarch Life presently has in force 1,556 structured settlement annuity policies issued in transactions where a third party owns the policy and assumes the tort defendant's obligations. Monarch Capital is the owner of 176 of these policies. Monarch Life has established a statutory reserve of $44 million for the 176 policies owned by Monarch Capital. Behind this reserve is a segmented portfolio containing assets worth about $44 million, which Monarch Life considers to be sufficient for present funding purposes.

## II. REQUESTED INJUNCTION

■ Norma Louise argues through counsel that the suit brought in state court to set aside the settlement entitles her to equitable relief in the form of a mandatory injunction requiring Monarch Capital to assign the policy to the Tort Defendants and their liability insurers. Paragraph 5 and 6 of the Qualified Assignment and Consent can only apply, however, to a *bona fide*

action to set aside the Settlement Agreement and Releases. No such contest exists here. By counsel's own admission, the state court proceeding was initiated solely as the result of Monarch Capital's precarious financial condition in an attempt to place the policy beyond the reach of its creditors. In filing the complaint, counsel sought to preserve the benefits of the settlement, not to contest it. Norma Louise is therefore not entitled to the requested injunctive relief.

The Trustee points out that under Bankr.R. 7001 equitable relief may only be obtained through the filing of a complaint initiating an adversary proceeding. My denial of the requested injunction moots this procedural objection. I base my ultimate decision upon the nature of Monarch Capital's property interest and upon the contractual rights held by Norma Louise and the others against both Monarch Capital and Monarch Life. Adjudication of the matter outside the context of an adversary proceeding is therefore appropriate.

## III. PROPERTY AND CONTRACT RIGHTS WITH RESPECT TO ANNUITY POLICY

The parties have all limited their arguments to the question of whether Monarch Capital as record owner holds the policy under an express, resulting, or constructive trust for the benefit of Norma Louise and the other named payees. This puts the cart before the horse. The record ownership rights of Monarch Capital must first be determined.

### A. *Monarch Capital's Property Rights*

■ Monarch Capital's rights in the policy are virtually nonexistent. It may not change the parties designated to receive a payee's benefits upon the death of the payee. It is given no right to surrender the policy or to obtain its cash value. The uncontradicted affidavit of Monarch Life's president affirms the parties' intention that Monarch Capital not be able to surrender the policy or obtain its cash value. Although the policy has a printed provision stating that income is to be paid to the owner, a specially typed provision requires that all payments, including both stated and unstated interest, be made to the designated payees. The latter provision controls because of its greater specificity. It is also significant that this is how payments have actually been made. The policy does have provisions allowing the owner to assign the policy, either outright or as collateral security. But Monarch Capital can only assign whatever rights it has in the policy; its ability to assign cannot enhance its interests.

Perhaps most significant, Monarch Capital as owner is given no right to change the manner of payments or the payees designated to receive the payments. Nor can any such right be inferred. It is not required to obtain the tax benefits conferred by Section 130. Indeed, such a right could be regarded as in conflict with the requirements of § 130 that annuity payments be "reasonably related" to the obligations assumed and that the assumed payments not be subject to change by the recipient. The right to make any such changes would also be in direct conflict with the settlement documents signed by the parties. Those documents require the payments as an absolute obligation. The annuity policy here is quite different from the settlement annuity policy involved in *Mandross v. First Colony Life Ins. Co.* (*In re Simon*), 99 B.R. 781 (Bankr.N.D.Ohio 1989), which required payments to be made to the tort defendant as owner or to such other party as the tort defendant may designate. It was because of these rights of the tort defendant that the court ruled against the bankruptcy trustee's attempt to bring the payments into the estate of the payee's bankruptcy.

### B. *Norma Louise's Contract Rights*

■ Standing in stark contrast to the absence of any provisions in the policy benefiting Monarch Capital are its provisions concerning payments to Norma Louise and the others. Norma Louise and the others, not Monarch Capital, are named as the parties to receive all payments. "If the promisee in a contract contemplates the

present or future existence of a duty or liability to a third party and enters into the contract with the expressed intent that the performance contracted for is to satisfy and discharge that duty or liability, the third party is a creditor beneficiary entitled to enforce the contract." *Choate, Hall & Stewart v. SCA Services, Inc.*, 378 Mass. 535, 543–44, 392 N.E.2d 1045, 1050 (1979) (quoting from 4 Corbin, Contracts § 787 at 95 (1951)). A party who is intended to receive only incidental benefits under a contract has no cause of action against the promisor. *Id.* Norma Louise and the other named payees are certainly creditor beneficiaries rather than incidental beneficiaries. They are named in the policy and are also the named creditors of Monarch Capital under its debt assumption agreement. The intention of Monarch Capital and Monarch Life to benefit them is overwhelmingly clear, even more so when the facts here are compared to the somewhat complex circumstances in *Choate, Hall & Stewart* where the law firm was declared a creditor beneficiary.

■ Arguably, the law of Colorado applies. Norma Louise and the others signed the two settlement documents there, and the Qualified Assignment and Consent contains a clause stating that it shall be "interpreted" pursuant to the laws of the State of Colorado. The result, however, is the same. Colorado also recognizes a cause of action on the part of a third party creditor upon whom contracting parties intend to confer a benefit. *E.B. Roberts Construction Co. v. Concrete Contractors, Inc.*, 704 P.2d 859, (Colo.1985); *Borwick v. Bober*, 34 Colo.App. 423, 529 P.2d 1351 (1974). In the *Roberts* case, the Supreme Court of Colorado indicated a willingness to examine the entire circumstances surrounding execution of the contract in order to determine whether the contracting parties intended to benefit the third party. Here, one need only read the contract consisting of the annuity policy and the application.

The Qualified Assignment and Consent states that the policy is to be the "sole property" of Monarch Capital, and that Norma Louise and the others "shall have

no right or interest therein." The Settlement Agreement and Release says that Monarch Capital "shall be the owner of the annuity policy (or policies) and shall have all rights of ownership." These provisions deprive the payees only of ownership of the policy, not of their right to receive the payments designated to be made to them under it. The quoted language speaks only of policy ownership. To construe it to be a waiver of the payees' rights as creditor beneficiaries would do violence both to these provisions and to the essence of the entire settlement arrangement.

The facts of this case are a simpler version of those involved in *Louisiana World Exposition, Inc. v. Federal Insurance Co.* (*In re Louisiana World Exposition, Inc.*), 832 F.2d 1391 (5th Cir.1987). The debtor there owned policies with various insurers insuring the debtor against its indemnification obligations to its directors and officers and also insuring its directors and officers for any liabilities and related legal expenses they might incur in connection with their positions. The creditors' committee had previously brought a suit on behalf of the bankruptcy estate against certain of the debtor's directors and officers seeking damages for their malfeasance in office. The committee then sued these same defendants and the insurance companies requesting an injunction against further payment of the defendants' legal expenses incurred in the pending litigation. The committee contended that it was entitled to the injunction because payment of the defendants' legal fees would deplete the coverage available to the bankruptcy estate on its malfeasance claim. Conceding that the bankruptcy estate owned the policy, the court of appeals for the Fifth Circuit nevertheless held that the directors and officers had rights in the *proceeds* which a representative of the bankruptcy estate could not affect. The court reasoned that although the estate was also a beneficiary of the policies, payment of legal expenses to the directors and officers reduced the estate's exposure under its indemnification obligation.

The present case is even clearer. The bankruptcy estate of Monarch Capital is

not a beneficiary of the policy, as was the estate in *Louisiana World Exposition* with respect to benefits for indemnification claims against it. Nor can any judgment entered in favor of Monarch Capital's bankruptcy estate be paid from the annuity policy. Norma Louise and the other payees have exclusive and unfettered rights to the policy payments.

The result is that Monarch Capital and Monarch Life are both obligated to Norma Louise and the others—Monarch Capital because of its assumption of the obligation of the Tort Defendants and Monarch Life because of its contract with Monarch Capital consisting of the policy and attached application. Norma Louise and the others are general creditors of both entities. As between Monarch Capital and Monarch Life, however, Monarch Life is primarily liable due to its contract with Monarch Capital. There is therefore economic sense in Monarch Capital showing its liability, as it did until 1990, by way of a footnote to its balance sheet describing itself as effectively acting as guarantor of the liability. The only other apparent alternative would be for it to show the value of the policy as an asset and offset this with the corresponding liability, but such treatment would be inconsistent with its limited ownership rights having little or no value.

### C. Principles of Trust Law

■ The contractual rights of Norma Louise and the other payees are not dependent upon Monarch Capital being deemed the owner of the policy under an express, resulting, or constructive trust for their benefit. However, the parties have devoted their briefs to a discussion of these trust principles and, regardless, Monarch Capital's property rights should be fully defined.

■ Limited as its ownership is, Monarch Capital does not hold the policy in an express, resulting, or constructive trust for the benefit of Norma Louise and the others. An express trust, by definition, arises from a declaration or agreement of trust. *Russell v. Meyers,* 316 Mass. 669, 56 N.E.2d 604 (1944); *Restatement (Second)*

*of Trusts,* § 17 (1959). There is no such declaration or agreement here. To the contrary, the parties agreed that the payees would have no ownership rights in the policy. There is no indicia of a trust such as a requirement that Monarch Capital hold funds separately. *See, e.g., In re Morales Travel Agency,* 667 F.2d 1069, 1071 (1st Cir.1981).

■ Nor does Monarch Capital own the policy in resulting trust. A resulting trust arises either in aid of an express trust or when one party pays for property which is placed in the name of another under circumstances indicating that the parties intended the one furnishing consideration to be the true owner. *Rand v. Goldblatt,* 347 Mass. 566, 199 N.E.2d 207 (1964); *Checovich v. Checovich,* 339 Mass. 71, 157 N.E.2d 643 (1959); *Collins v. Curtin,* 325 Mass. 123, 89 N.E.2d 211 (1949); *Braga v. Braga,* 314 Mass. 666, 51 N.E.2d 429 (1943); *Page v. Clark,* 197 Colo. 306, 314–15, 592 P.2d 792, 797 (1979); *Restatement (Second) of Trusts,* §§ 404–460 (1959). It is true that Norma Louise furnished consideration when she released the Tort Defendants of their obligations to her. But Monarch Capital also furnished consideration when it assumed these same obligations. The parties intended, moreover, that Monarch Capital have the limited rights in the policy which it has. The Tort Defendants and their liability insurers wanted to be released from their obligations and to be entirely divorced from the mechanics of providing payment to Norma Louise. In order to accomplish this, it was necessary that someone else own the policy.

■ A constructive trust is a remedial device designed to prevent unjust enrichment. 1 G. Palmer, *The Law of Restitution,* §§ 1.3, 1.4 (1978); 5A Scott, *The Law of Trusts,* § 461, 462 (4th ed. 1989); *Restatement of Restitution,* § 160, Comment a (1937). A court will declare a party constructive trustee of property for the benefit of another if he acquired the property through fraud, mistake, breach of duty or under other circumstances indicating that he would be unjustly enriched in retaining it. *Id.; Nessralla v. Peck,* 403 Mass. 757,

762–53, 532 N.E.2d 685, 689 (1989); *Barry v. Covich*, 332 Mass. 338, 342, 124 N.E.2d 921, 924 (1955); *Page*, 197 Colo. at 315, 592 P.2d at 797.

■ A bankruptcy estate can be declared to hold property in constructive trust notwithstanding the claims of creditors and notwithstanding the strong arm powers of the estate's representative under § 544(a) of the Bankruptcy Code. *In re Mill Concepts Corp.*, 123 B.R. 938, 944–47 (Bankr.D.Mass.1991). But the estate of Monarch Capital is not unjustly enriched in retaining its minuscule ownership rights in the policy. This is so even though under § 130 Monarch Capital and not Norma Louise received the tax benefits under the debt assumption arrangement because Norma Louise was already fully protected by § 104(a)(2). Monarch Capital's inability to derive any benefits from the policy hardly indicates unjust enrichment. Monarch Capital, moreover, incurred a liability, albeit one funded by the policy, when it assumed the obligations of the Tort Defendants. That liability would bring about more than a footnote to its balance sheet should Monarch Life be visited with financial problems sufficient to require a default in its obligations under the policy.

Monarch Capital has been guilty of no inequitable conduct, nor has any party acted under mistake. Monarch Capital's function as applicant and owner of the policy was designed to facilitate the insurance business of its subsidiary and to satisfy the desire of the Tort Defendants and their insurer to be relieved of all absolute and contingent liability. The parties accomplished exactly what they intended to accomplish—novation of the Tort Defendants' settlement obligations and avoidance by both Norma Louise and Monarch Capital of any income tax consequences from payments under the policy.

IV. CONCLUSION

A separate order has issued in accordance with the foregoing. The order denies the requested transfer of the policy, defines the parties' rights in the policy, and permits Monarch Life to continue making payments to Norma Louise and the other named payees.

There is no need for additional litigation over each of the other 175 structured settlement annuity policies owned by Monarch Capital, two of which are already subject to motions filed by annuitants. Unless and until reversed on appeal or stayed pending appeal, this opinion with today's order is the law of the case. There are no disputed facts; even if there were, Monarch Capital would be bound under the doctrine of issue preclusion. Today's order therefore provides that Monarch Life is free to make payments under all similarly structured settlement annuity policies owned by Monarch Capital, without violation of the automatic stay and without being subject to any claim on behalf of the bankruptcy estate of Monarch Capital.