**In re Charles Joseph HAYES III, Debtor.**

**Bankruptcy No. 92–21010–7.**

United States Bankruptcy Court,
D. Kansas.

June 9, 1994.

Richard C. Wallace of Evans & Mullinix, P.A., Lenexa, KS, for debtor.

Norman E. Fretwell and Betsy Morgan Garvin of Watson, Ess, Marshall & Enggas, Kansas City, MO, for United Missouri Bank.

James M. Holmberg of Lentz & Clark, P.A., Overland Park, KS, for Chapter 7 Trustee, Carl R. Clark.

## MEMORANDUM OPINION

JOHN T. FLANNAGAN, Bankruptcy Judge.

The debtor, Charles Joseph Hayes III, appears by his attorney, Richard C. Wallace of Evans & Mullinix, P.A., Lenexa, Kansas. The creditor, United Missouri Bank, appears by its attorneys, Norman E. Fretwell and

Betsy Morgan Garvin of Watson, Ess, Marshall & Enggas, Kansas City, Missouri. The Chapter 7 trustee, Carl R. Clark, appears by his attorney, James M. Holmberg of Lentz & Clark, P.A., Overland Park, Kansas.

## BACKGROUND

This contested matter involves questions of attachment of a security interest, exclusion of property from the bankruptcy estate, and exemption of estate property. It began with the debtor becoming entitled to receive annuity payments under a structured tort settlement. He then granted United Missouri Bank ("UMB") a security interest in the annuity payments to collateralize personal and corporate loans for the purchase of a new business. The business failed, and debtor filed this voluntary Chapter 7 on May 5, 1992.

Although debtor executed a security agreement with UMB, he denies that the bank holds a security interest in the annuity payments. To advance this argument, debtor maintains that the annuity contract is the equivalent of a spendthrift trust under state decisional law and by operation of Kansas Statutes Annotated § 40–414a. If this were true, neither the contract nor its payments could be subject to a prepetition security interest, nor could they be included in the bankruptcy estate because of the spendthrift exclusion of § 541(c)(2). Debtor further contends that the annuity and its payments are exempt under K.S.A. § 60–2312(b) which allows a debtor to exempt any property listed in subsection (d)(10) of § 522 of the Bankruptcy Code.[1]

In his schedules, as amended, debtor purports to exempt the annuity payments from the bankruptcy estate. United Missouri Bank objects to debtor's initial and amended exemption claims and moves for relief from the automatic stay, asking that the annuity payments be declared its cash collateral under 11 U.S.C. § 363. The trustee also objects to the exemption claim, hoping to appropriate the payments for the estate if

UMB's security interest proves unenforceable against his powers.

On May 29, 1992, after considering UMB's motions for stay relief and adequate protection, The Honorable Benjamin E. Franklin prohibited debtor from using cash collateral pending decision of the issues. To maintain the status quo, Judge Franklin ordered the debtor and the annuity issuer, Life Insurance Company of North America, to turn over to the trustee, Carl R. Clark, all payments received under the annuity contract until further order of the Court.

At hearings held before Judge Franklin on June 18, 1992, and August 4, 1992, UMB supported its motion for relief from the automatic stay to recover the annuity payments. The issues for decision were under advisement when Judge Franklin passed away on April 7, 1993. Upon reassignment of the case, I obtained transcripts of the June and August hearings and gave the parties further opportunity to present evidence, argument, and briefs.

## FINDINGS

### The Injury

As shown by the testimony and a Statement of Stipulated Facts, the significant events began with debtor's injury in the July 1981 collapse of the skywalks surrounding the atrium of the Hyatt Regency Hotel in Kansas City, Missouri. The skywalk collapse crushed debtor's legs and compressed vertebrae in his back. After four and one-half months in the hospital, a year of physical therapy, and additional periodic treatment, debtor was able to walk again. In March 1982, he returned to his job as a news reporter at WHB Radio on a part-time basis; in 1983, he began working full time.[2]

### The Tort Structured Settlement

In 1982, debtor entered into a structured settlement of his injury claims. As is customary, the tort settlement was designed to deny debtor control of the funds paid to compensate for his injuries so that he could

---

1. Kansas has opted out of the other federal exemptions found in 11 U.S.C. § 522(d) as authorized by 11 U.S.C. § 522(b)(1). *See* K.S.A. 60–2312(a).

2. Transcript of June 18, 1992, Hearing at 27–29.

exclude the payments from his gross income for federal income tax purposes.[3]

Under the settlement, debtor signed a General Release of All Claims and Agreement ("General Release").[4] Although the General Release contains a Missouri choice-of-law provision, the parties do not suggest that it has caused any dispute, and each has advanced arguments based upon Kansas law. Since there is no dispute about which state's laws apply, and since debtor filed his bankruptcy case in Kansas and was a Kansas resident when he entered into the disputed transactions with UMB, Kansas law will be applied.

The General Release settled all debtor's personal injury claims against the Hyatt Corporation, Hyatt Hotels Corporation, Crown Center Redevelopment Corporation, Hallmark Cards, Incorporated, and other potential defendants.

The tortfeasors were insured for liability by Centaur Insurance Co.; INSCO, LTD.; and Pine Top Insurance Co. In consideration for the General Release, the insurance companies agreed to the following schedule of payments. The debtor testified that the payments were compensation to him for past and future medical expenses, past and future wages, and past and future pain and suffering,[5] but the General Release does not apportion the payment total among these elements:

(1) $200,000.00 cash, paid at the time of the settlement to debtor and his attorneys;

(2) $1,500.00 per month, for life, 20 years guaranteed, with the first guaranteed monthly payment to begin December 1, 1982;

(3) $50,000.00 guaranteed cash payment on November 1, 1987;

(4) $50,000.00 guaranteed cash payment on November 1, 1992;

(5) $100,000.00 guaranteed cash payment on November 1, 1997;

(6) $125,000.00 guaranteed cash payment on November 1, 2002; and

(7) $150,000.00 guaranteed cash payment on November 1, 2007.[6]

The General Release addresses the assignment of the insurers' obligations under the agreement and the form of an annuity contract to be purchased for debtor's benefit, to wit:

3. It is understood and agreed by and between the parties hereto that the Insurers may, as a matter of right and in their sole discretion, assign their duties and obligations to make such future payments to INA Reinsurance Company pursuant to an Assumption–Reinsurance agreement in the sample form attached hereto as Exhibit A. Such assignment, if made, is hereby accepted by the Releasing Party hereto without right of rejection and in full discharge and release of the duties and obligations of the Insurers and all parties released by this agreement with respect to such future payments. In the event the Insurers assign the duties and obligations as provided herein, it is understood and agreed by and between the parties that INA Reinsurance Company or its designee shall mail said future payments directly to the Releasing Party hereto.

4. It is further understood and agreed by the undersigned that, with the exception of the $200,000.00 payable at the time of settlement, all future payments hereunder may, at the option of the Insurers, or their assignee, INA Reinsurance Company, be funded by the purchase of an Annuity from Life Insurance Company of North America which, by its terms, will provide for payment of the above amounts. If such Annuity Contract is purchased, such Contract shall be in a form such as that attached hereto as Exhibit B. *The Releas-*

---

**3.** The principle feature of the tax exclusion structure is that debtor must have no control over the funds paid to compensate for his injuries. *See* Robert A. Laing, "What Every Lawyer Needs to Know About Structured Settlements," *The Journal of the Kansas Bar Association*, Winter 1983, at 280.

**.4.** United Missouri Bank's Trial Exhibit No. 11.

**5.** Transcript of June 18, 1992, Hearing at 30.

**6.** General Release of All Claims and Agreement, United Missouri Bank's Trial Exhibit No. 11, at 2.

*ing Party hereto shall have no legal interest, vested or contingent, in such Contract.* (Emphasis added.) [7]

This language establishes: (1) that the insurers had the right, at their discretion, to assign to INA Reinsurance Company ("INA") their obligations to make the future payments; (2) that debtor could not reject the settlement if the assignment occurred; (3) that the insurers, or their assignee, INA, had the option to purchase an annuity from Life Insurance Company of North America ("LICNA") to provide for the scheduled payments listed in the General Release; (4) that if the insurers assigned their liability to INA Reinsurance Company, they would be released from any further liability and INA would assume that liability; and (5) that if an annuity was purchased, it would state that the debtor "shall have no legal interest, vested or contingent, in such Contract."

*The Annuity*

As the parties anticipated, the insurers assigned their tort obligations to INA and it purchased a single premium annuity contract from LICNA for debtor's benefit.[8] The annuity contract establishes INA Reinsurance Company as its owner; the debtor, Charles J. Hayes III, as the annuitant; and Jayne L. Hayes, debtor's wife, as the beneficiary. The significant provisions of the annuity contract are:

| | | | |
|---|---|---|---|
| ANNUITANT | Charles J. Hayes, III | SA 0987674 | POLICY NUMBER |
| DATE OF BIRTH | December 8, 1948 | 34 | AGE OF ANNUITANT |
| ANNUITY COMMENCEMENT DATE | December 1, 1982 | $1,500.00 | INCOME PAYMENT |
| | | | SINGLE PREMIUM |
| INTERVAL OF PAYMENT | 1 MONTH(S) | | |
| | | | NUMBER OF INCOME |
| DATE OF ISSUE | October 1, 1982 | 240 | PAYMENTS CERTAIN |
| BENEFICIARY | Jayne L. Hayes, Wife | INA Reinsurance Company | OWNER |

SEE ENDORSEMENTS

. . . .

PAYMENT. Any sums due from the Company shall be payable at the Administrative Office. Payments falling due during the lifetime of the Annuitant will be paid to the Annuitant. Subject to the rights of an assignee, payments after the death of the Annuitant will be paid in accordance with any beneficiary designation in effect at the date of death. If there is no designation or no surviving beneficiary at the death of the Annuitant or of any other payee, the Company will pay in a single sum to the estate of the last surviving payee the commuted value of the remaining payments, on the basis of interest at the rate of 7½% a year, compounded annually.

CHANGE OF BENEFICIARY. During the lifetime of the Annuitant, the Owner may change the beneficiary by filing written request satisfactory to the Company at the Administrative Office. A designation shall not take effect unless so filed, but if filed it will be effective as of the date signed, subject to any payment made or action taken by the Company before such filing.

. . . .

ASSIGNMENT. No assignment of this policy shall bind the Company unless in writing and until filed at the Administrative Office. The Company assumes no responsibility for the validity or sufficiency of any assignment.[9]

———

In addition to the other scheduled payments in the General Release, debtor is entitled to receive, as the annuitant, $1,500.00 per month for 240 months from December 1, 1982, to December 1, 2002, whether or not he lives. In total, the monthly payments equal $360,000.00. If debtor dies before the end of

---

7. General Release of All Claims and Agreement, United Missouri Bank's Trial Exhibit No. 11, at 2–3.

8. Statement of Stipulated Facts filed July 26, 1993, no. 3, at 1.

9. Annuity Contract, United Missouri Bank's Trial Exhibit No. 10 at 1–2.

the 20–year period, the beneficiary named in the annuity contract is entitled to receive the monthly payments for the balance of the 20–year period. If there is no designated or surviving beneficiary, debtor's estate will receive the balance of the payments commuted to a single sum. Debtor does not own the annuity contract; he is only entitled to the stream of payments it provides. Since the contract provides that only the owner can change the beneficiary, debtor has no power to effect such a change unless the owner of the contract, INA Reinsurance Company, will honor debtor's request to do so. The contract itself is subject to assignment, but, of course, only by its owner, INA Reinsurance Company.

While the annuity contract designates debtor's wife, Jayne L. Hayes, as beneficiary, the documents in evidence show that Mr. and Mrs. Hayes were divorced about the time of the settlement and that Mrs. Hayes relinquished all of her beneficiary rights under the annuity contract.[10]

*The Security Agreements and Financing Statements*

In early 1991, debtor became interested in going into business for himself. To locate a business, he "went through" a business broker. The broker suggested that the debtor could increase his chances of getting a loan to finance the business purchase by assigning his annuity payments as collateral.[11] To this end, debtor prevailed upon his personal injury attorney, John T. Verbanic, to verify the assignability of the annuity payments by writing an inquiry letter to a representative of LICNA.[12] Although the LICNA reply, marked as Exhibit 12 at the June 18, 1992, hearing, was offered into evidence,[13] Judge Franklin denied its admission.[14] Even so,

the transcript shows that the letter was identified as a communication that the debtor "could pledge his stream of payments to borrow against." [15]

At the June 18, 1992, hearing, UMB called John Geiger as a witness and identified him as its assistant vice president and commercial lending officer who dealt with debtor. Geiger testified that in February 1991, he was introduced to debtor by a business broker. The broker characterized the debtor as a person interested in acquiring a business who had not yet found a specific business to buy. In their conversations, the debtor told Geiger that he had annuity payments that he could offer as collateral for a loan to finance the purchase. Geiger testified that he was shown the actual annuity contract and a letter from CIGNA stating that the payments could be assigned.[16] Both Geiger and debtor testified that debtor was the first person to suggest that the stream of payments from the annuity could be assigned as loan collateral.[17]

About a month after their first meeting, debtor returned to Geiger to discuss the purchase of a business called Schneider–Bailey Radiator and Auto Repair. This discussion resulted in Geiger obtaining the UMB loan committee's approval of debtor's application for both a personal and a corporate loan to purchase the company. Geiger also sought and obtained SBA approval of the loan for C.III, Inc., the corporation the debtor formed to make the purchase and operate the business. On April 8, 1991, the debtor, his corporation, C.III, Inc., and UMB entered into several agreements: (1) a Collateral Installment Note to UMB in consideration for a $170,000.00 loan to debtor; (2) an SBA Note in consideration for a $455,000.00

---

10. *See* Letter dated December 11, 1991, from Jayne L. Hayes to Gloria Feliciano, Account Administrator for CIGNA, United Missouri Bank's Trial Exhibit No. 14, and Agreement dated March 22, 1991, wherein Jayne L. Hayes waives her beneficiary interest in the annuity, United Missouri Bank's Trial Exhibit No. 15. Why the letter was written to CIGNA is not clear. The Court assumes CIGNA to be affiliated with LICNA.

11. Transcript of June 18, 1992, Hearing at 37.

12. Transcript of June 18, 1992, Hearing at 34–35. See footnote no. 10 about CIGNA.

13. Transcript of June 18, 1992, Hearing at 15.

14. Transcript of June 18, 1992, Hearing at 18.

15. Transcript of June 18, 1992, Hearing at 15.

16. Transcript of June 18, 1992, Hearing at 14.

17. Transcript of June 18, 1992, Hearing at 19 and 37.

loan to C.III, Inc.; and (3) a Security Agreement, Pledge and Assignment of Annuity Payments executed by debtor.[18] United Missouri Bank then filed financing statements in the appropriate offices on April 10, 1991.[19]

According to Geiger, the debtor was to pay the $170,000.00 personal loan directly from payments received from the assignment of the annuity payments. Similarly, the lump sum distributions were to be applied to the personal loan.[20] Geiger said that his bank's loans would not have been made without the annuity payments being pledged as security.[21] Specifically, he stated that "the stream of payments were [sic] going to be back-up collateral to shore-up the collateral deficiency" on the corporate loan,[22] and "[o]n the collateral, based on the value of the equipment, inventory, and accounts receivables it was insufficient as far as the total purchase price."[23]

As more fully described in the parties' Statement of Stipulated Facts, another series of loans was made in November and December 1991.[24] More specifically, on December 5, 1991, debtor executed and delivered a second Security Agreement, Pledge and Assignment of Annuity Payments which is identical in terms to the initial assignment.

On December 11, 1991, after this second assignment, UMB wrote to LICNA, the annuity insurer, requesting that the annuity payments be sent directly to it.[25] Under the terms of the assignment, debtor agreed to instruct LICNA to make all payments directly to UMB.[26] In the event that payments were made to debtor, he was to deliver them to UMB in the form received.[27] From April 1991 to February 1992, debtor forwarded all payments from the annuity to UMB.[28] He then defaulted on his obligations to UMB; he is currently in default.[29] The various amounts due UMB are set out in the Statement of Stipulated Facts. After application of other collateral, the total is $587,020.00 plus interest.[30]

## DISCUSSION

### Annuity Not a Spendthrift Trust

 Debtor suggests that the annuity contract is not only a trust, but a spendthrift trust. He argues that as a spendthrift trust, the contract and its payments are beyond the reach of his creditors and the trustee under 11 U.S.C. § 541(c)(2), the provision of the Bankruptcy Code that excludes from the estate a debtor's beneficial interest in a trust enforceable under applicable non-bankruptcy law. This argument requires only brief attention. The Kansas Court of Appeals has this to say about the nature of a spendthrift trust:

A spendthrift trust is a trust created to provide a fund for the maintenance of a beneficiary and at the same time to secure the fund against his improvidence or incapacity. Provisions against alienation of the trust fund by the voluntary act of the

18. Statement of Stipulated Facts filed July 26, 1993, nos. 6–8 at 2.

19. Financing Statements filed with the Kansas Secretary of State, United Missouri Bank's Trial Exhibit No. 8, and Financing Statements filed with the Johnson County Register of Deeds, United Missouri Bank's Trial Exhibit No. 9.

20. Transcript of June 18, 1992, Hearing at 21.

21. Transcript of June 18, 1992, Hearing at 21.

22. Transcript of June 18, 1992, Hearing at 24.

23. Transcript of June 18, 1992, Hearing at 25.

24. Statement of Stipulated Facts filed July 26, 1993, nos. 14–17, at 3–4.

25. Statement of Stipulated Facts filed July 26, 1993, no. 18, at 4.

26. Security Agreement, Pledge and Assignment of Annuity Payments dated April 8, 1991, United Missouri Bank's Trial Exhibit No. 6, Section 3, at 2–4, and Security Agreement, Pledge and Assignment of Annuity Payments dated December 5, 1991, United Missouri Bank's Trial Exhibit No. 7, Section 3, at 1–2.

27. Id.

28. Statement of Stipulated Facts filed July 26, 1993, no. 19, at 4.

29. Statement of Stipulated Facts filed July 26, 1993, no. 20, at 4.

30. Statement of Stipulated Facts filed July 26, 1993, nos. 22–26 at 4–5.

beneficiary or by his creditors are its usual incidents.

A requisite to the creation of such a trust is that the trustor clearly manifest the intention not only to create a trust, but to create it with the spendthrift effect. (76 Am.Jur.2d, Trusts, § 150). The intent need not be stated in express terms but may come from construction of the trust instrument as a whole. Inference of the intent to create such a trust must be made with reasonable certainty and cannot come from loose and vague declarations. (76 Am.Jur.2d, supra, § 38).

*In re Estate of Sowers,* 1 Kan.App.2d 675, 680, 574 P.2d 224, 228 (1977) (citations omitted).

The annuity contract is not a spendthrift trust.[31] There is no indication that the annuity contract was intended to be a trust, much less a spendthrift trust. As discussed later, it contains no language that could be considered as restricting alienation of the annuity contract or its payments or barring creditors from attaching either. Accordingly, debtor has no beneficial interest in a trust enforceable under applicable non-bankruptcy law, and all of his legal and equitable interests in the annuity or its payments come into the bankruptcy estate via 11 U.S.C. § 541(a), unless they are excluded by some other rule.

*Prepetition Security Interest*

Although the debtor offered UMB his annuity payments as loan collateral, he now argues that he could not have granted UMB a prepetition security interest in something he did not own. Nevertheless, he signed Security Agreements describing the collateral as follows:

2. PLEDGE, ASSIGNMENT AND GRANT OF SECURITY AGREEMENT. In consideration of credit which may be extended to Borrower by bank and to C.III, Inc. (a Kansas corporation) by bank now or at any time hereafter, Borrower hereby assigns to Bank, pledges to Bank, and grants to Bank a security interest in any and all monies, payments and claims due or to become due to Borrower under an annuity contract issued on October 20, 1982 by Life Insurance Company of North America as policy number SA 0987674 and any and all renewals, extensions and proceeds thereof and substitutions therefore.[32]

The financing statement filed with the Kansas Secretary of State [33] mirrors this language beginning with the word "Borrower" in the main clause.

The underlying question is whether an annuitant can grant a security interest in annuity payments due him from an annuity that he does not own.

Debtor has offered no cases on this point. The cases the Court has found are not helpful. For the most part, they do not expressly treat "attachment" of a security interest to incorporeal or intangible forms of collateral such as a right to a stream of payments. Rather, they assume that such a security interest has attached and go on to decide whether the security interest is "perfected" under the UCC. *See In re Southworth,* 22 B.R. 376 (Bankr.D.Kan.1982) (holding, inter alia, that a secured creditor who failed to file a UCC financing statement did not perfect a security interest in assigned payments under a contract for deed of realty that were considered to be personal property); *In re Southern,* 32 B.R. 761 (Bankr.D.Kan.1983) (holding that the right to receive payments under an installment land sale contract is a "general intangible" under K.S.A. § 84-9-106; therefore, the bank holding an assignment of the right had to have filed a financing statement to perfect against the trustee); *Matter of Newman,* 993 F.2d 90 (5th Cir. 1993) (finding that an annuity contract was a "general intangible" rather than an "instrument;" therefore, creditor had to file a fi-

---

**31.** Nor is it an insurance policy. *In re Vinzant,* 108 B.R. 752 (Bankr.D.Kan.1989) (holding that annuity policies were not "insurance policies," assignment of which are excepted from Uniform Commercial Code).

**32.** Security Agreement, Pledge and Assignment of Annuity Payments dated April 8, 1991, United Missouri Bank's Trial Exhibit No. 6, Section 2, at 1–2, and Security Agreement, Pledge and Assignment of Annuity Payments dated December 5, 1991, United Missouri Bank's Trial Exhibit No. 7, Section 2, at 1.

**33.** United Missouri Bank's Trial Exhibit No. 8.

nancing statement rather than take possession of the contract to perfect its security interest); *Crichton v. Himlie Properties, Inc. (In re Himlie Properties, Inc.)*, 36 B.R. 32 (Bankr.W.D.Wash.1983) (holding the right to receive payments under a contract for the sale of real property was a general intangible).

One case, *Northwest Acceptance Corp. v. Lansdowne*, 93 B.R. 243 (Bankr.D.Or.1988), does hold that a security interest can attach to an employer's reversionary interest in a pension plan.

Unlike the specific collateral description in this case, the collateral descriptions in these cases are generic in form, following the property classifications defined by the UCC, i.e., "accounts," "general intangibles," etc.

■ But, for purposes of "attachment" of a security interest, as contrasted with its "perfection," K.S.A. § 84–9–203 does not require that property interests be straightjacketed into the UCC's property classifications. A security interest can attach to any form of collateral so long as the requirements of K.S.A. § 84–9–203 are satisfied and Article 9 is otherwise applicable.

Debtor does not dispute that most of the prerequisites for the attachment of a prepetition security interest under K.S.A. § 84–9–203(1)(a) are present. He does not deny that he signed a security agreement granting UMB a security interest, that it contains language adequately describing the annuity payments due him, and that the lender gave value for his signature. Neither does the debtor deny that UMB filed a financing statement in the appropriate office to perfect whatever security interest it may have received. Rather, the debtor's position is that he has no "rights in the collateral" to which a security interest could attach because by the terms of the settlement agreement and the annuity contract, he has no ownership interest in the annuity contract itself.

The debtor is correct that he holds no ownership rights in the annuity contract itself and therefore cannot grant a security interest in the contract per se.[34] However, the debtor's legal position permits him to grant a security interest in the payments due him under the annuity.

Since by the terms of the General Release, the insurers' liability is assignable to identified third parties in a document to which debtor is a party, the agreement can be viewed as making the assignee and the annuity issuer directly liable to debtor for the annuity payments, for which he has given consideration by releasing the tortfeasors from liability. In the General Release, the debtor gives up his tort claims in return for the schedule of payments and accepts "without right of rejection" any forthcoming assignment to INA of the insurers' obligations to him. This view was taken in *Walro v. Striegel (In re Striegel)*, 131 B.R. 697 (S.D.Ind.1991), where the court held that the debtor's promise to release joint tortfeasors in a personal injury settlement agreement in exchange for a lump-sum payment and periodic payments was a classic example of a bilateral contract in which consideration was given in the form of a promise for a promise or a promise to forbear from taking some action.

At the least, debtor is an intended third-party beneficiary of the annuity contract between INA and LICNA. INA, the assignee of the insurers, has a contractual duty to the debtor to make the agreed payments. LICNA, the annuity issuer, has a contractual duty to INA to make the annuity payments to debtor as annuitant; albeit, it has no direct contractual obligation to debtor, and debtor has no ownership of the annuity contract. However, debtor does have a right to the annuity payments through INA's contractual duty to him coupled with LICNA's contractual duty to INA.

Debtor's rights under this settlement are like those of Norma Louise in *In re Monarch Capital Corp.*, 130 B.R. 368 (Bankr.D.Mass. 1991). Substituting INA for Monarch Capital, LICNA for Monarch Life, and debtor for Norma Louise, the following quotation from the *Monarch Capital* case aptly describes the pattern here:

> The result is that Monarch Capital [INA] and Monarch Life [LICNA] are

---

**34.** *See* text following footnote no. 8.

both obligated to Norma Louise [Debtor] . . .—Monarch Capital [INA] because of its assumption of the obligation of the Tort Defendants and Monarch Life [LICNA] because of its contract with Monarch Capital [INA] consisting of the policy and attached application. Norma Louise [Debtor] and the others are general creditors of both entities. As between Monarch Capital [INA] and Monarch Life [LICNA], however, Monarch Life [LICNA] is primarily liable due to its contract with Monarch Capital.

*Id.* at 376. (Substituted names in brackets.)

■ Like Massachusetts, Kansas recognizes the right of an intended third-party beneficiary to enforce a contract. *French v. French,* 161 Kan. 327, 167 P.2d 305 (1946) (holding that a third person may maintain an action on a valid contract made by others for his benefit even though he was not a party thereto and had no knowledge of it on the date of its consummation); *Martin v. Edwards,* 219 Kan. 466, 548 P.2d 779 (1976) (finding that a beneficiary can enforce a contract if he is the one who the contracting parties intended should receive a direct benefit from the contract); *Fasse v. Lower Heating & Air Conditioning, Inc.,* 241 Kan. 387, 736 P.2d 930 (1987) (deciding that where a person makes a promise to another for the benefit of a third person, that third person may maintain an action to enforce the contract even though he had no knowledge of the contract when it was made and paid no part of the consideration); *Cornwell v. Jespersen,* 238 Kan. 110, 708 P.2d 515 (1985) (classifying beneficiaries to third-party contracts by dividing them into three classes: donee beneficiaries, creditor beneficiaries, and incidental beneficiaries; only those falling in the first two classes may enforce contracts made for their benefit); *Noller v. General Motors Corp.,* 244 Kan. 612, 772 P.2d 271 (1989) (ruling that only intended beneficiaries may sue for breach of contract).

Whether the debtor is entitled to enforce the annuity obligation directly as a contracting party or as third-party beneficiary, he is entitled to receive the payments each month, and if the annuity company fails to make the payments through no fault of the debtor, he can sue to enforce the obligation of LICNA under the annuity. He would have a claim for relief for past due monthly payments and the right to performance of the annuity contract, i.e., reinstatement and continuation of the payments.

Admittedly, INA has continued to make the annuity payments throughout this litigation. There has been no breach of its obligations that has created a present cause of action, but the term "chose in action" is broad enough to include debtor's right to receive the payments without having a matured cause of action, as reflected in the following summary of the law.[35]

**§ 25. Choses in action.**

A chose in action has been defined as a personal right not reduced into possession, but recoverable by a suit at law. It has been defined also as a thing of which one has not the possession or actual enjoyment, but only *a right to or a right to demand* by an action at law. It has been said that a chose in action more properly includes the idea both of the thing itself and of the right of action as annexed to it. . . .

*The terms "choses in actions" and "debts" are used by courts to represent the same thing when viewed from opposite sides. The chose in action is the right of the creditor to be paid, while the debt is the obligation of the debtor to pay. Choses in action are personal property,* although the terms, purpose, or application of a particular statute may be such as to require a construction which does not so include them.

. . . .

**§ 26.—Rights of action constituting choses in action.**

The term "choses in action" may be used in two senses. It is sometimes used in the broad sense of all rights of action, whether ex contractu or ex delicto, but *it is fre-*

---

**35.** *C.f. Meridian Bank v. Bell Fuel Corp. (In re Bell Fuel Corp.),* 99 B.R. 602 (E.D.Pa.1989) (suggesting that under Pennsylvania law a claim against an insurance company is not a chose in action that can be collateral for a security interest until the company rejects the claim).

*quently used in a more limited sense, which confines it to assignable rights of action ex contractu....*

The term "chose in action" is one of comprehensive import. It includes the infinite variety of contracts, covenants, and promises which confer on one party the right to recover a personal chattel or a sum of money from another by action. Thus, *the general class of choses in action includes money due on a bond, note, or other contract, damages due for breach of contract, for the detention of chattels, or for torts, and the rights of action for recovery thereof.* As illustrating the comprehensiveness of the term in this respect, *it has been held to include open or unliquidated accounts, bills and accounts receivable, the right to receive contract payments under a contract for the sale of real property, and a policy of insurance.* Shares of corporate stock are regarded as personal property in the nature of choses in action, as are certificates of corporate stock.

63A Am.Jur.2d *Property* (1984) § 25 at 256–57 and § 26 at 257–58 (emphasis added) (footnotes omitted).

■ Under Kansas law, a chose in action arising out of a contract is assignable generally, as recognized in *Commodore v. Armour & Co.*, 201 Kan. 412, 418, 441 P.2d 815 (1968):

We are cognizant that no particular form is necessary to effect a valid assignment in Kansas (*Hall v. Terra Cotta Co.*, 97 Kan. 103, 154 Pac. 210) and that assignments of accounts, sums due or to become due, including wages or any chose in action, ex-

cept one arising in tort, are recognized and enforced.

*See also First National Bank of Topeka v. United Tel. Ass'n*, 187 Kan. 29, 353 P.2d 963 (1960) (holding that the assignor was not a necessary party to an action on an assignment of all monies due or to become due on a construction contract); *Augusta Metal Complex, Inc. v. Blue Cross*, 230 Kan. 361, 634 P.2d 1123 (1981) (finding that the term "chose in action" refers to right to be paid and, generally speaking, assignments thereof are valid and enforceable); *Alldritt v. Kansas Centennial Global Exposition*, 189 Kan. 649, 657, 371 P.2d 181 (1962) (citing Kansas cases supporting the proposition that "all choses in action, except torts, are assignable"); *National Bond & Investment Co. v. Midwest Finance Co.*, 156 Kan. 531, 134 P.2d 639 (1943) (finding a lien to be a chose in action and citing cases and statute law for the idea that in Kansas all choses in action, except torts, are assignable).

There is every reason to believe that the same is true under the Kansas version of the Uniform Commercial Code because, while perfection of UMB's security interest is not at issue here, the Kansas UCC provisions on perfection do recognize that "things in action" are a form of property within its purview.[36] Section 84–9–106 of Kansas Statutes Annotated describes intangible property to include "things in action." Furthermore, no one would question that under § 541 the debtor's right to the payments is a substantial enough legal or equitable interest to constitute "property" that passes into the bankruptcy estate with the filing of the petition.

---

36. The trustee took exception to the debtor's claim that the payments were outside the bankruptcy estate or, if they were within the estate, that they were exempt. But, so far he has not challenged UMB's security interest in the payments. As between UMB and the debtor, it is of no consequence whether the security interest is perfected since UMB can enforce it against the debtor. K.S.A. § 84–9–203. If the question of perfection of UMB's security interest does arise, since debtor has no rights in the annuity contract itself, there will be no need to analyze whether it should be classified as an "instrument" or "chattel paper" for perfection purposes. The debtor's right to the payments must be either an account or a general intangible under K.S.A. § 84–9–106.

Both "accounts" and "general intangibles" are perfected by filing a financing statement with the appropriate office. K.S.A. § 84–9–401(1)(c). If UMB has filed appropriately, there will be no need to decide into which of those categories to place debtor's rights to the annuity payments. Either way, UMB would have perfected a security interest in the chose in action representing the annuity payments. Since accounts are defined in terms of "goods sold or leased or ... services rendered" (K.S.A. § 84–9–106), which were not involved here, and general intangibles include "things in action" (K.S.A. § 84–9–106), which describes debtor's right to the payments, the annuity payments logically fall within the class of general intangibles.

Therefore, even though debtor had no ownership rights in the annuity contract itself, he was a prepetition creditor of LICNA. This prepetition contract right to the stream of annuity payments from LICNA is debtor's personal property in the nature of a chose in action, a present right to receive future payments.[37]

The right to receive payments is collateral properly described in the security agreement signed by the debtor and a representative of UMB. The debtor had "rights in the collateral" to which a prepetition security interest attached under the Kansas version of the Uniform Commercial Code, K.S.A. § 84–9–203(1)(a), unless prevented by some other statute or rule.

*Kansas Statute Annotated Section 40–414a*

■ Independent of the Kansas Uniform Commercial Code's technical requirements, debtor posits that a prepetition security interest could not have attached to the annuity payments because K.S.A. § 40–414a makes the payments unreachable by UMB and his other prepetition creditors. For the same reason, debtor denies the payments are estate property.[38]

■ This Kansas statute was originally enacted in the 1933 Kansas Session Laws at § 1, Chapter 204, June 5. The caption to the statute as set out in the session laws is more complete than what now appears in K.S.A. § 40–414a, which reads, "Trust provisions in contracts; restrictions on alienation; exemptions." As pointed out in *In re Douglas*, 59 B.R. 836, 839 n. 4 (Bankr.D.Kan.1986), the headings that appear in the statute book are prepared by the Revisor of Statutes, not by the Kansas Legislature; thus, statutory headings are not to be considered in determining the intent of the Legislature. Since the captions in the Legislative session laws are more complete and therefore provide more evidence of the intent of the Legislature enacting the law, the 1933 session law version is set out below.

## CHAPTER 204

AUTHORIZING CERTAIN TRUST PROVISIONS IN CONNECTION WITH LIFE INSURANCE CONTRACTS, AND PERMITTING RESTRICTIONS ON ALIENATION THEREOF, AND MAKING THE PROCEEDS FREE FROM THE CLAIMS OF CREDITORS.

House Bill No. 20.

AN ACT to authorize certain trust provisions in connection with life insurance contracts, and permitting restrictions on alienation thereof, and making the proceeds free from the claim of creditors.

*Be it enacted by the Legislature of the State of Kansas:*

SECTION 1. *Provisions of policies and contracts as to interest of beneficiaries.* When a contract of annuity, a policy of insurance, or other contract of a life insurance company authorized to do business in this state is entered into with any person for the benefit of another, *and such contract so provides,* a person entitled to any of the proceeds retained thereunder by said company or to interest thereon shall not be permitted to commute, anticipate, encumber, alienate, or assign the principal or interest thereon, or any part thereof, nor shall any part of such principal or interest be subject to the claims of

---

37. When money is paid to debtor under the annuity contract, it represents the proceeds of the debtor's chose in action. Section 84–9–203(3), Kansas Statutes Annotated, gives the secured party the rights to proceeds unless otherwise agreed in the security agreement.

38. If K.S.A. § 40–414a applied according to its terms, it would have the effect of removing the payments at issue from the reach of debtor's creditors in the same way as if an annuity were held to be a spendthrift trust. Some would say that the payments were "exempt" from the debtor's creditors by operation of the statute. However, to avoid confusion in this discussion of K.S.A. § 40–414a, the word "exempt" is used in its bankruptcy sense only, i.e., it refers to property that comes into the bankruptcy estate but is subject to being removed from the estate and returned to the debtor because of a state or federal exemption statute. In referring to the effect of K.S.A. § 40–414a, where it is assumed to apply, property will be spoken of as being "excluded" from the estate, as would be the case if the annuity were a spendthrift trust, not passing into the estate under § 541(a) in the first instance because of § 541(c)(2).

creditors of any such person, nor be in any way subject to such person's debts, contracts, or engagements, or to any judicial process to levy upon or attach such proceeds for payment of such claims or demands, and such contracts shall be valid and enforceable.

SEC. 2. This act shall take effect and be in force from and after its publication in the statute book.

Approved March 10, 1933.

(Emphasis added.)

While this particular statute appears never to have been construed in a Kansas state court decision, its meaning has been examined in an unpublished Kansas bankruptcy court opinion, which was affirmed on appeal by the district court. *In re Humbert*, No. 91–13315, slip op. at 10, 1992 WL 674744 (Bankr.D.Kan. December 23, 1992); *In re Humbert*, Civ.A. No. 93–1006–PFK, 1993 WL 343116 at *2 (D.Kan. August 4, 1993).

In *Humbert*, a Chapter 7 trustee objected to debtor's claim that K.S.A. § 40–414a excluded an annuity contract (the Guaranty Security Policy) from the bankruptcy estate of a debtor. The debtor was a wife whose husband did not join her in the bankruptcy petition but who was the annuitant. The wife was the owner as well as beneficiary of the annuity. By specific language in the annuity, the wife could not alienate the contract in her capacity as beneficiary, but she could reach its cash value in her capacity as owner. The wife had purchased the annuity contract with the cash surrender proceeds of a life insurance policy on the life of her husband of which she was also the owner. In the first part of its opinion, the court held that the wife had purchased the annuity and that it therefore constituted a self-settled trust which could not be a spendthrift trust under Kansas law. *See* K.S.A. § 33–101. The court went on to rule that K.S.A. § 40–414a did not exclude the annuity contract from the estate, stating:

K.S.A. § 40–414a specifically provides that the annuity contract must be entered into "for the benefit of another." Moveover, the language "and such contract so provides," emphasizes that the annuity must, on its face, provide that it was entered into for the benefit of another.

The Guaranty Security policy was entered into by the debtor for the benefit of herself. Even though the debtor's husband's funds were used to purchase the policy, without a specific notation in the policy providing that the debtor's husband was purchasing the annuity for the benefit of the debtor, the Court cannot conclude that the Guaranty Security policy falls within the parameters of K.S.A. § 40–414a.

*In re Humbert*, No. 91–13315, slip op. at 10, 1992 WL 674744 (Bankr.D.Kan. December 23, 1992).

The court felt that the annuity contract was not entered into for the benefit of the wife, and that the annuity must "on its face" so provide in order to be given effect. The statute could only operate on the interest of the person intended to be benefitted who, in *Humbert*, was not the debtor wife.

This case is different. The statute speaks of "beneficiaries," "benefit of another," and "a person entitled to any of the proceeds...." While Mr. Hayes was named the "annuitant," rather than a "beneficiary" under the structured settlement, the annuity was clearly purchased for his exclusive benefit. His interest in the payments is the one being considered as immune from the prepetition claims of his creditors and excludable from the bankruptcy estate under the Kansas statute, even though he holds no ownership interest in the annuity contract itself. While debtor's former wife was the designated "beneficiary" in the annuity, she has waived her right to that status. Mr. Hayes falls within the term "beneficiary" for purposes of the statute, even though he is called the annuitant in the contract.

Nevertheless, the *Humbert* court's ruling that the clause "and such contract so provides" refers to antecedent language and means that the annuity must state "on its face" that it is for the benefit of another is subject to question. The focus of the statute is on contracts of annuity, policies of insurance, and contracts of life insurance "entered into with any person for the benefit of another." It is difficult to imagine that such documents would not show "on their face" who

they are to benefit. Such contracts are virtually always "for the benefit of another." They invariably contain language designating the issuer, owner, beneficiary, and annuitant and by their very nature show who is intended to be benefitted. They present few problems for anyone trying to determine for whose benefit they are issued. Why then would the Legislature write into the statute that such an express statement of benefit must appear in the document when it would be expected that the annuity or policy would make this clear by its very nature?

Read as in *Humbert,* the statute makes the proceeds of all third-party beneficiary annuity contracts and insurance policies non-alienable and unattachable without regard to the intent of the parties to such arrangements as expressed in the terms of the contract. Surely, the Legislature intended to so restrict such contracts and their proceeds only when the contracts themselves evidenced a clear intent to do so.

A more sensible construction of the statute is that the clause "and such contract so provides" refers to subsequent language, not antecedent language. The statute begins with the subordinate clause, "When a contract . . . is entered into with any person for the benefit of another. . . ." This clause is dependent on the following main clause stating that a "person entitled to any of the proceeds retained thereunder . . . shall not be permitted to commute. . . ." The first dependent clause is followed by the clause reading "and such contract so provides." This clause should be viewed as coordinate with the first clause and having the meaning "and *when* such contract so provides." So viewed, the second clause is also dependent on the subsequent main clause which limits the beneficiary's powers and those of his or

her creditors over the contract proceeds. When read in this way, the statute establishes two conditions for the operation of the language in the main clause: (1) there must be a contract of annuity entered into with a person for the benefit of another person, and (2) the contract must contain provisions that restrict the beneficiary's right to alienate the annuity or its proceeds or the ability of his or her creditors to attachment them. When these conditions are met, the beneficiary is prohibited from alienating and his creditors from attaching the proceeds. Only when the contract contains provisions stating that the person entitled to the proceeds cannot alienate them and that they cannot be attached by creditors can the main clause be operative.

The headings in the session laws reproduced above are consistent with this view. They speak of "trust provisions," "permitting restrictions on alienation," and "making the proceeds free from the claims of creditors." The heading of Section 1 is *"Provisions of policies and contracts* as to the interest of beneficiaries." (Emphasis added.)

The annuity in this case contains no such language restricting alienation or shielding the payments from debtor's creditors. Therefore, K.S.A. § 40–414a does not apply to withhold the annuity payments from the reach of UMB's prepetition security interest or to exclude those payments from the bankruptcy estate under § 541(c)(2). United Missouri Bank's security interest attached to the annuity payments prepetition and they are included in the bankruptcy estate encumbered by its lien.

*Exemption Claim*

The final question is whether debtor can claim the payments exempt from the bankruptcy estate under 11 U.S.C. § 522(d)(10)(C) and (E).[39] In light of the

---

39. **§ 522. Exemptions.**
 (d) The following property may be exempted under subsection (b)(1) of this section:
 . . . .
 (10) The debtor's right to receive—
 . . . .
 (C) a disability, illness or unemployment benefit;
 . . . .
 (E) a payment under a stock bonus, pension, profit sharing, annuity, or similar plan or contract on account of illness, disability, death,

age, or length of service, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor, unless—
 (i) such plan or contract was established by or under the auspices of an insider that employed the debtor at the time the debtor's rights under such plan or contract arose;
 (ii) such payment is on account of age or length of service; and
 (iii) such plan or contract does not qualify under section 401(a), 403(a), 403(b), 408, or

holding that the UMB security interest attached to the annuity payments prepetition, neither the debtor nor the trustee will care about the exemption issue unless the payments exceed the amount of UMB's lien. Or, perhaps UMB's lien is subject to a trustee's avoidance power, in which event the exemption question becomes important.

The briefs do not adequately address the questions raised by the debtor's claim of exemption under K.S.A. § 60–2312 and 11 U.S.C. § 522(d)(10). The Court therefore declines to decide the exemption question until after a pretrial conference to settle the issues to be considered and submission of further briefs by counsel.

## CONCLUSION

United Missouri Bank has expressed an intention to bargain with the annuity issuer for commutation of the payments to a lump sum for application to its secured debt.[40] For the reasons stated, the automatic stay is lifted to the extent necessary to allow UMB to discuss with the annuity issuer the commutation of the stream of payments.[41] The annuity payments remain property of the bankruptcy estate until further order of the Court.

The foregoing discussion shall constitute findings of fact and conclusions of law under Fed.R.Bankr.P. 7052 and Fed.R.Civ.P. 52(a). The Court finds that this proceeding is core under 28 U.S.C. § 157 and that the Court has jurisdiction under 28 U.S.C. § 1334 and the general reference order of the District Court effective July 10, 1984.

IT IS SO ORDERED.

## JUDGMENT

This contested matter involves questions of attachment of a security interest, exclusion of property from the bankruptcy estate, and exemption of estate property.

The debtor, Charles Joseph Hayes III, appears by his attorney, Richard C. Wallace

of Evans & Mullinix, P.A., Lenexa, Kansas. The creditor, United Missouri Bank, appears by its attorneys, Norman E. Fretwell and Betsy Morgan Garvin of Watson, Ess, Marshall & Enggas, Kansas City, Missouri. The Chapter 7 trustee, Carl R. Clark, appears by his attorney, James M. Holmberg of Lentz & Clark, P.A., Overland Park, Kansas.

Based on the Memorandum Opinion entered in this proceeding, the Court rules that the annuity is not a spendthrift trust, that United Missouri Bank has a security interest in the annuity payments enforceable against the debtor, that K.S.A. § 40–414a is inapplicable to the annuity contract or payments, and that ruling on the exemption question raised by K.S.A. § 60–2312 and 11 U.S.C. § 522(d)(10) should be deferred pending further pretrial conference to settle the issues to be considered and submission of further briefs by counsel. The Court further rules that the automatic stay is lifted to the extent necessary to allow United Missouri Bank to discuss with the annuity issuer the commutation of the stream of payments, but the Court expresses no opinion on whether the debtor could successfully contest such a commutation. The annuity payments remain property of the bankruptcy estate until further order of the Court.

IT IS SO ORDERED.

409 of the Internal Revenue Code of 1954 (26 U.S.C. 401(a), 403(a), 403(b), 408, or 409).

**40.** Transcript of August 4, 1992, Hearing at 24–25.

**41.** The Court expresses no opinion on whether the debtor could successfully contest such a commutation.