**In re ABBEY FINANCIAL CORP., Debtor.**

**FIRST UNION NATIONAL BANK OF FLORIDA, Plaintiff,**

**v.**

**ABBEY FINANCIAL CORP., Defendant.**

**Bankruptcy No. 94–41473–JFQ.
Adv. No. 94–4147.**

United States Bankruptcy Court,
D. Massachusetts.

Feb. 29, 1996.

---

Peter B. McGlyn, Bernkopf, Goodman & Baseman, Boston, MA, for First Union National Bank of Florida.

Gordon M. Jones, III, Hanify & King, Boston, MA, for Abbey Financial Corporation.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

First Union National Bank of Florida ("First Union") seeks (i) judgment declaring that its postpetition charge to the checking account of Abbey Financial Corporation (the "Debtor") was a permissible recoupment or

setoff, and (ii) recovery of funds transferred to the Debtor allegedly by mistake, plus the imposition of a constructive trust in aid of that recovery. Both parties move for summary judgment. I hold First Union's charge to the Debtor's account was a postpetition setoff, not recoupment, exercised in violation of the automatic stay. I decline to retroactively annul the stay to validate the setoff. I also hold First Union's payment to the Debtor did not create an allowable claim as a payment made under mistake and, even if it did, First Union's failure to trace the transferred funds prevents the imposition of a constructive trust in First Union's favor.

First Union supports its summary judgment motion by affidavit and documentary evidence. The Debtor offers no affidavit or other materials in opposition to First Union's motion or in support of its own motion, relying instead on the facts contained in First Union's supporting material. Accordingly, if that material contains no evidence on an essential element of either party's case, I must enter judgment against that party.[1]

## I. FACTS

Prior to ceasing operations, the Debtor was in the business of making first mortgage residential loans which it sold on the secondary mortgage market. It opened a checking account with First Union on October 18, 1993. On March 24, 1994, two checks drawn by the Debtor (and deposited by the payees with other banks) were presented to First Union for payment. They were check No. 2225 in the sum of $79,460.19 and check No. 2257 in the sum of $70,451.81. There were then insufficient funds in the account to pay the checks. First Union neither returned nor honored them. Instead, it held the checks and "reprocessed" them the next day, which was a Friday, and again on Monday, March 28th. On neither of these days did the account have a sufficient balance to cover them. On March 28th, First Union returned both checks through various collecting banks to the depository banks.

On April 1, 1994, the Debtor filed a petition under chapter 11 with this court, thereby invoking the protection of the automatic stay. On April 7th, the Federal Reserve notified First Union that check No. 2257 had not been returned by the midnight deadline and First Union was responsible for paying it pursuant to section 674.302(1)(a) of the Florida Uniform Commercial Code. On that same day, First Union paid the check and debited its amount, $70,451.81, to the Debtor's account. The account still had a credit balance after the debit.

The next day, April 8th, Debtor's counsel faxed a letter to First Union demanding that the account's entire balance be wired to the account the Debtor had just opened as a debtor in possession with Barnet Bank (the "DIP") account). Counsel threatened contempt sanctions if First Union refused to make the transfer. First Union wired the account's balance, $59,745.83, to the DIP account that same day.

Later that day, April 8th, the Federal Reserve notified First Union it was responsible for paying check No. 2225 because First Union had also failed to return that check by the midnight deadline. First Union immediately paid the check and debited the Debtor's account, thereby creating an overdraft of $79,460.19.

Shortly after bringing suit, First Union moved for an order directing the Debtor to segregate $59,745.83, the amount of First Union's postpetition payment to the Debtor. The parties thereafter stipulated to an order, entered on April 28, 1994, requiring the segregation of this sum pending the outcome of the case.

## II. ABSENCE OF MISTAKE

First Union says its payment of $59,745.83 to the Debtor was made under mistake. It is vague on the specific nature of the mistake. It says that at the time of the payment it "was unaware of any other charge-back items which it was entitled to recoup against credits," and that it "made a mistake and transferred monies postpetition to the debtor that the debtor had no right to receive or retain...." I take it what First Union is saying is that it made the payment under the mistaken belief it had no claim against the

---

1. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Debtor, whereas it then had a $79,460.19 contingent claim in that amount. The contingency consisted of First Union honoring check No. 2225.

■ Under principles of unjust enrichment, a payment caused by a unilateral mistake is recoverable by the payor unless other factors, such as a subsequent change in circumstances, make it inequitable to require restitution.[2] That principle, however, has no application here. This is so for two reasons.

In the first place, at the time it made the $59,745.83 payment, First Union labored under no mistake as to the facts supporting its contingent claim against the Debtor. First Union knew it had missed its midnight deadline on check No. 2225. As a result, it knew it had incurred liability on the check. That deadline, under the Uniform Commercial Code as in effect in Florida, was midnight of the banking day in which it received the check, March 24, 1994.[3] Once First Union retained the check without "settling" for it by midnight of March 24th, it became responsible to pay it.[4] In delaying the return of the check to Monday, March 28th, First Union missed its midnight deadline by more than a full banking day. This case is far different from those in which courts have ordered recovery of a mistaken payment. In *Citizens Fed. Bank v. Cardian Mortgage Corp. (In re Cardian Mortgage Corp.),*[5] for example, the court held a bank's customer had been unjustly enriched when the bank mistakenly posted a credit, rather than a debit, to the account.

First Union cannot be said to have been mistaken even as to its legal rights. It knew very well the legal consequences of missing a midnight deadline on a check. Indeed, it had been reminded of its midnight deadline liability only the day before, when the Federal Reserve required it to honor check No. 2257, which had been presented and returned on the same day as check No. 2225. Thus at the time of the payment, First Union was not mistaken as to its legal rights and obligations concerning check No. 2225. To the contrary, in making the $59,745.83 payment First Union disregarded its rights. First Union could have "frozen" the account without being guilty of making a postpetition setoff in violation of the automatic stay.[6] Such a lapse on the part of a financial institution hardly invokes sympathy.

■ There is no unjust enrichment of the Debtor for a second reason. Unlike the classic mistaken payment case, the recipient here had a claim to the sum transferred. Because the relationship between a bank and its deposit account customer is one of debtor and creditor, First Union then owed the Debtor the $59,745.83 paid. Moreover, the Debtor was then in chapter 11, subject to many claims against it. True, as discussed below, First Union had the right to set off its claim provided the setoff was first approved by this court. But having made the payment, First Union's claim is just like that of any other creditor.

## III. LACK OF TRACING NECESSARY FOR CONSTRUCTIVE TRUST

First Union seeks more than allowance of a $59,745.83 claim against the Debtor. In aid

---

**2.** *E.g.,* RESTATEMENT OF RESTITUTION §§ 15–28, 59–69 (1937); *In re Berry,* 147 F. 208, 210 (2d Cir.1906) (because debtor was paid twice by its broker after a stock sale due to a bookkeeper's mistake, equity imposed a constructive trust on the funds the debtor received by virtue of the mistake); *Bank of Alex Brown v. Goldberg (In re Goldberg),* 158 B.R. 188, 193 (where debtor had already been refunded a down payment and bank mistakenly issued a second refund check to debtor, check subject to constructive trust in favor of bank); *Citizens Fed. Bank v. Cardian Mortgage Corp. (In re Cardian Mortgage Corp.),* 122 B.R. 255, 259 (Bankr.E.D.Va.1990) (bank credited debtor's account instead of debiting it; state law imposed constructive trust in favor of bank for erroneous credit); *Traveler's Ins. Co. v. Angus (In re Angus),* 9 B.R. 769, 771 (Bankr.D.Or.1981) (where insurer paid debtor for loss of ring and ring was later found, debtor held ring in constructive trust for benefit of insurer); *Capital Bank v. Country Club Casuals, Inc. (In re Country Club Casuals, Inc.),* 1 B.R. 274, 277 (Bankr. S.D.Fla.1979) (where factor mistakenly transferred funds to debtor, as a result of using wrong form, and funds were traceable, bank entitled to restitution).

**3.** FLA.STAT. § 674.302(1)(a) (1995).

**4.** *Id.*

**5.** 122 B.R. 255 (Bankr.E.D.Va.1990).

**6.** *Citizens Bank of Maryland v. Strumpf,* —— U.S. ——, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995).

of its claim, it also asks for imposition of a constructive trust on the funds transferred.

■ As this court has previously observed, a constructive trust is imposed as a remedial device to prevent unjust enrichment when a party acquires property as the result of fraud, mistake or under other circumstances indicating he would be unjustly enriched if permitted to retain the property.[7] There is reason not to impose a constructive trust here beyond the absence of any mistake. A constructive trust is an *in rem* remedy. The transfer at issue in this case is a cash payment that went into the Debtor's DIP account. First Union has made no effort to trace those funds. I can impose a $59,745.83 constructive trust on the account only if the account always equalled or exceeded that amount from the time of payment.[8] First Union has offered no evidence on this. It is not aided by the April 28, 1994 consent order requiring the Debtor to segregate $59,745.83 in a separate account. That order simply required a segregation from the Debtor's general funds. It was not an adjudication that First Union had traced its payment. I have no idea of what activity took place in the account during the three weeks that elapsed between the payment and the order.

## IV. ABSENCE OF FIRST UNION'S RECOUPMENT RIGHTS

■ When on April 7th the Federal Reserve notified First Union it had to pay check No. 2257 in the sum of $70,451.81, First Union paid the check and immediately reimbursed itself by debiting the Debtor's account in the same amount. First Union asserts this was recoupment pursuant to the parties' deposit agreement, not setoff, and for that reason was not a violation of the automatic stay. Recoupment is indeed outside the scope of the automatic stay. For reasons best known to Congress (there is no legislative history), section 362 refers only to setoff. Although this may have been an oversight, the distinction between the two rights is sufficient to prohibit interpreting the statute as covering recoupment, and courts have so held.[9] The justification offered for this preferential treatment given recoupment is the perception that recoupment is somehow permissible because it is a defensive remedy, even though like setoff recoupment is a remedy to collect a claim. It has thus been said that "where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable." [10]

■ Accordingly, to rule First Union's postpetition chargeback was a proper exercise of recoupment, I must find the parties' reciprocal claims arose out of the same transaction. The term "transaction" is not easily defined. Black's definition, set forth below,[11]

7. *In re Monarch Capital Corp.*, 130 B.R. 368, 376 (Bankr.D.Mass.1991); *In re Mill Concepts Corp.*, 123 B.R. 938, 948 (Bankr.D.Mass.1991); *see* RESTATEMENT OF RESTITUTION § 160 (1937).

8. *In re Berry*, 147 F. 208, 211 (2d Cir.1906); *American Mayflower Life Ins. v. Fagan (In re Fagan)*, 166 B.R. 531, 536 (Bankr.E.D.N.Y.1993); *Lane Bryant, Inc. v. Vichele Tops, Inc. (In re Vichele Tops, Inc.)*, 62 B.R. 788, 791 (Bankr. E.D.N.Y.1986).

9. *E.g., University Medical Ctr. v. Sullivan (In re University Medical Ctr.)*, 973 F.2d 1065, 1080 (3d Cir.1992); *Holford v. Powers (In re Holford)*, 896 F.2d 176, 178 (5th Cir.1990); *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155, 157 (10th Cir.1986).

10. *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984).

11. Act of transacting or conducting any business; between two or more persons; negotiation; that which is done; an affair. An act, agreement, or several acts or agreements between or among parties whereby a cause of action or alteration of legal rights occur ... It may involve selling, leasing, borrowing, mortgaging or lending. Something which has taken place, whereby a cause of action has arisen. It must therefore consist of an act or agreement, or several acts or agreements having some connection with each other, in which more than one person is concerned, and by which the legal relations of such persons between themselves are altered. It is a broader term than "contract."
BLACK'S LAW DICTIONARY 1496 (6th ed. 1990) (citations omitted).

is not helpful, although it does suggest that "transaction" is a broader term than "contract." However, the case law is not uniform on · that point. For instance, in *Mohawk Industries, Inc. v. United States (In re Mohawk),*[12] I noted that the debtor's and creditor's rights must arise under the same transaction, "typically the same contract." In a similar vein, the Eighth Circuit has stated:

> The fact that the same two parties are involved, and that a similar subject matter gave rise to both claims ... does not mean that the two arose from the "same transaction." In bankruptcy, the recoupment doctrine has been applied primarily where the creditor's claim against the debtor and the debtor's claim against the creditor arise out of the same contract.[13]

In *Bob Brest Buick, Inc. v. Nissan Motor Corp. (In re Bob Brest Buick, Inc.),*[14] the court suggests the possibility of expanding that vision of recoupment. It found that a single contract between the parties gave rise to the claims at issue, and then commented: "[i]ndeed, a comprehensive single agreement may not even be necessary if the relationship of the contracts is sufficiently close."[15]

Adding to the thicket, in *University Medical Center v. Sullivan (In re University Medical Center),* the Third Circuit noted that while recoupment often occurs where the claims arise out of a single contract, "an express contractual right is not necessary to effect recoupment ... nor does the fact that a contract exists between the debtor and creditor automatically enable the creditor to effect a recoupment."[16] The court believed this flowed from the doctrine's equitable nature. Indeed, in *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.),* the court said

the presence of a single contract does not resolve the question of whether monthly purchases arose out of the same transaction for recoupment purposes.[17] This seems to cut against Black's statement that "transaction" is a broader concept than "contract."

It is apparent that a determination of whether the "same transaction" is involved cannot begin and end with a simple definition. As the Eighth Circuit noted in *United States v. Dewey Freight System, Inc.,*[18] it is not surprising that the courts refrain from precisely defining the same-transaction standard, given the equitable nature of the recoupment doctrine, and instead focus on the facts and equities of each case.

Influenced by recoupment's immunity from the stay, courts questionably permit recoupment between prepetition and postpetition claims, even though setoff with court approval would not be permissible because of lack of mutuality due to the difference between the prepetition debtor and the postpetition debtor in possession acting in a fiduciary capacity. Creditors have been allowed to recoup prepetition overpayments against a debtor's claim for postpetition work down under the same contract.[19] A company which prior to the petition overpaid a musician for advance royalties pursuant to a recording contract has been allowed to recoup the advances against postpetition royalties.[20] Postpetition recoupment has been allowed where prepetition progress payments were made in excess of the value of the work done on a construction contract, and the work continued postpetition.[21] An airline has been permitted to recoup loans, deferrals and overpayments against postpetition revenue due the debtor, a commuter airline, under a service agree-

---

12. 82 B.R. 174, 176 (Bankr.D.Mass.1987).

13. *Lee,* 739 F.2d at 875.

14. 136 B.R. 322 (Bankr.D.Mass.1991).

15. 136 B.R. at 324.

16. 973 F.2d at 1080.

17. 782 F.2d at 158.

18. 31 F.3d 620, 623 (8th Cir.1994).

19. *See B & L Oil,* 782 F.2d at 158–59 (an oil delivery order under which creditor had right to,

from month to month, buy all or any part of oil debtor produced); *Mohawk Indus.,* 82 B.R. at 178 (supply contract under which debtor received progress payments from which value of goods later delivered was deducted).

20. *Waldschmidt v. CBS, Inc.,* 14 B.R. 309 (M.D.Tenn.1981).

21. *United States v. Midwest Serv. and Supply Co., Inc. (In re Midwest Serv. and Supply Co., Inc.,* 44 B.R. 262, 266 (D.Utah 1983).

ment.[22] Some, but not all, courts have allowed prepetition Medicare overpayments made to a debtor hospital to be recouped against payments owed the hospital for patients treated postpetition.[23] A lessor has been permitted to recoup damages resulting from the debtor-lessee's fraudulent inducement of lease by withholding portion of the rent owed the debtor.[24]

The common thread in the decisions ruling recoupment rights are present is that the rights are derived from a single agreement. The contract often called for numerous, separate deliveries, services or payments over a period of time. In finding a single transaction, the courts looked to the agreement of the parties and found the conduct at issue within the scope of the agreement. It has not mattered whether the contract expressly provided for the recoupment, although some did. For example, in *Holford v. Powers (In re Holford),*[25] there was no provision in the lease authorizing the lessee to withhold payments. The court ruled this did not foreclose the right of recoupment, a doctrine equitable in nature. What mattered was that the rights at issue—to recover damages for fraud in the inducement and to receive rental payments—both arose from the lease.

First Union would have me look to its depositor's agreement with the Debtor, which provides:

OVERDRAFT. If there is not enough money in your account or there is not enough money available in your account to cover a check or any preauthorized withdrawal, we may, at our option, pay the check.... You agree to pay the over-

drawn amount.... We may charge back the overdraft.

What First Union did, however, does not come within these provisions. It did not at its "option" pay check No. 2257 and thereby voluntarily create an overdraft. Instead, it retained the check, apparently in the hope deposits would increase the account balance sufficiently to permit it to honor all checks which had been presented. When that did not happen, it returned both check No. 2257 and check No. 2225. The contract does not cover that conduct.

 Because recoupment permits better treatment of one creditor than others, its application in bankruptcy should be narrow.[26] That the same parties and subject matter are involved does not mean the claims arose from the same transaction.[27] First Union's handling of these checks is sufficiently outside the terms of the parties' agreement so as to make its debit of the account an act of setoff. This case is similar to *In re NWFX, Inc.,*[28] a dispute between an issuer of money orders and its agent, a grocery store, which sold the money orders. When the debtor-issuer defaulted in payment of some of the orders, the store voluntarily paid them and then sought to recoup its payment from funds due the debtor on later money order sales. The Eighth Circuit held the nexus between the voluntary payments and the later sales was too remote to support recoupment.

## V. THE $70,451.81 DEBIT AS AN IMPERMISSIBLE SETOFF

 First Union argues, in the alternative, it was entitled to debit the account

**22.** *Northeast Express Regional Airlines, Inc. v. Northwest Airlines, Inc. (In re Northeast Express Regional Airlines, Inc.),* 169 B.R. 258, 260 (Bankr.D.Me.1994).

**23.** *Sapir v. Blue Cross/Blue Shield of Greater New York (In re Yonkers Hamilton Sanitarium Inc.),* 34 B.R. 385, 387 (S.D.N.Y.1983); *Visiting Nurse Ass'n of Tampa Bay, Inc. v. Sullivan (In re Visiting Nurse Ass'n of Tampa Bay, Inc.),* 121 B.R. 114, 120 (Bankr.M.D.Fla.1990). *Contra University Medical Ctr.,* 973 F.2d at 1080 (reimbursement payments made for any one year arise from transaction distinct from payments made for another year); *Lee,* 739 F.2d at 876 (social-welfare statute entitling individual to benefit is not contract and thus obligation to repay a person's overpayment is separate debt).

**24.** *Holford,* 896 F.2d at 178.

**25.** 896 F.2d at 178 (citing *B & L Oil,* 782 F.2d at 159).

**26.** *See, e.g., B & L Oil,* 782 F.2d at 158; *Electronic Metal Prods., Inc. v. Honeywell, Inc.,* 95 B.R. 768, 770 (D.Colo.1989); *Raleigh v. Mid American Nat'l Bank and Trust Co. (In re Stoecker),* 131 B.R. 979, 983 (Bankr.N.D.Ill.1991); *In re Public Serv. Co. of N.H.,* 107 B.R. 441, 444 (Bankr. D.N.H.1989).

**27.** *Lee,* 739 F.2d at 875.

**28.** 864 F.2d 593 (8th Cir.1989).

pursuant to the doctrine of setoff. The right of a creditor to set off a prepetition debt owed the debtor against a prepetition claim against the debtor is provided for in section 553 of the Code.[29] Section 553 does not create a right of setoff; it merely preserves the rights available under state law, here Florida law.[30] The law in Florida, as elsewhere, permits setoff where there exists mutuality of claims between the parties.[31] The claims of First Mutual and the Debtor were mutual. Although First Mutual did not pay check No. 2257 until after the bankruptcy filing, this does not mean its resulting claim was against the debtor in its fiduciary capacity as debtor in possession. First Mutual returned the check, missing its midnight deadline, prior to the filing. It thus had a prepetition contingent claim against the debtor. Its postfiling payment of the check merely made that prepetition claim absolute.

The presence of mutual debts does not, however, end the analysis. Section 553 provides that title 11 does not affect the right to set off mutual debts "[e]xcept as otherwise provided in ... section ... 362" governing the automatic stay.[32] A party wishing to setoff after the filing must therefore first seek and receive relief from the automatic stay. First Union did not do that and therefore violated the stay.

First Union apparently had no knowledge of the bankruptcy filing when it set off its claim. Because its act was an unintentional violation, it asks that I retroactively validate the setoff. Violations of the stay are voidable, rather than void.[33] Accordingly, I have the authority to grant retroactive relief from the stay and validate the setoff.[34]

Retroactive relief from stay is not appropriate in this case. First Union's assertion that it did not then know of the filing appears in its brief, not its affidavit, and thus cannot be considered in the context of these motions. Lack of knowledge would not, in any event, be enough to justify retroactive relief here. Courts require a reversal of a postpetition setoff, and order a turnover, regardless of lack of knowledge of the filing on the creditor's part.[35] Some courts do not even

---

29. This section provides, in relevant part:
 (a) Except as otherwise provided ... this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case.... 11 U.S.C. § 553 (1988).

30. *E.g., United States v. Norton,* 717 F.2d 767, 772 (3d Cir.1983); *Sisk v. Saugus Bank & Trust Co. (In re Saugus Gen. Hosp., Inc.),* 698 F.2d 42, 44 (1st Cir.1983); *Styler v. Jean Bob Inc. (In re Concept Clubs, Inc.),* 154 B.R. 581, 586 (D.Utah 1993); *Cain v. Mappa (In re Pineview Care Ctr., Inc.),* 152 B.R. 703, 709 (D.N.J.1993); *Shugrue v. Fischer (In re Ionosphere Clubs, Inc.),* 164 B.R. 839, 841 (Bankr.S.D.N.Y.1994).

31. *Griffin v. Gulf Life Ins. Co.,* 146 So.2d 901, 902 (Fla.Dist.Ct.App.1962) (citing *Everglade Cypress Co. v. Tunnicliffe,* 107 Fla. 675, 148 So. 192 (1933)); *see, e.g., Southeast Bank v. Grant (In re Apex Int'l Management Servs., Inc.),* 155 B.R. 591, 594 (Bankr.M.D.Fla.1993) (mutuality requires debts must be between same parties standing in same capacity); *Mohawk Indus.,* 82 B.R. at 176.

32. 11 U.S.C. § 362 (1988).

33. *E.g., Bronson v. United States,* 46 F.3d 1573, 1578 (Fed.Cir.1995); *In re Siciliano,* 13 F.3d 748, 751 (3d Cir.1994); *Sikes v. Global Marine, Inc.,* 881 F.2d 176 (5th Cir.1989); *Commercial Credit Corp. v. Reed,* 154 B.R. 471, 475 (E.D.Tex. 1993); *Weiss v. Azran (In re Thunderbolt Realty Trust),* 190 B.R. 11 (Bankr.D.Mass.1995); *Beair v. Polhamus (In re Beair),* 168 B.R. 633 (Bankr. N.D.Ohio); *In re Barker–Fowler Elec. Co.,* 141 B.R. 929, 936–37 (Bankr.W.D.Mich.1992) (stay should be annulled in extremely limited circumstances); *Russell v. Russell (In re Russell),* 141 B.R. 107, 111 n. 3 (Bankr.W.D.La.1992). *But see Easley v. Pettibone Michigan Corp.,* 990 F.2d 905, 909 (6th Cir.1993) (and cases cited therein).

34. *Id.*

35. *See Official Committee of Unsecured Creditors of Operation Open City v. New York State Dept. of State (In re Operation Open City),* 170 B.R. 818, 825 (S.D.N.Y.1994) (finding postpetition setoff void in absence of relief from stay); *In re Miel,* 134 B.R. 229, 233–36 (Bankr.W.D.Mich.1991) (stating postpetition setoffs void but then entertaining and denying motion to lift stay nunc pro tunc); *Hassett v. Far West Fed. Sav. and Loan Assn (In re OPM Leasing Servs., Inc.),* 40 B.R. 380, 403 (Bankr.S.D.N.Y.1984), *aff'd,* 44 B.R. 1023 (S.D.N.Y.1984); *Harris v. United States Gov't (In re Harris),* 19 B.R. 624, 626 (Bankr. E.D.Pa.1982); *Mealey v. Department of Treasury (In re Mealey),* 16 B.R. 800, 802 (Bankr.E.D.Pa. 1982); *Nelson v. First Nat'l Bank & Trust Co.,* 6 B.R. 248, 251 (Bankr.D.Kan.1980).

consider the issue of knowledge.[36] Others treat lack of knowledge as ground not to hold the creditor in contempt for violating the stay.[37] Retroactively validating a stay violation solely because the creditor was not aware of the filing would render the stay largely meaningless.[38] Its purpose is to bring order out of what is often a chaos of creditor collection action which is dissipating the debtor's assets.[39] This is particularly important as to bank setoff because it involves cash, a vital commodity.

Congress chose to treat setoff quite uniquely. Section 553 contains more than a general authorization for postpetition setoff so long as the court first vacates the automatic stay. It also authorizes the estate representative to avoid a prepetition setoff on essentially the same conditions that the representative can avoid prepetition preferential transfers.[40] The reason seems obvious. Setoff can be very much like a preferential transfer. Yet the right of setoff also resembles the right enjoyed by a secured creditor. Section 553 accordingly treats prepetition setoff like a preference and yet permits postpetition setoff, subject only to the automatic stay with its requirement of adequate protection. To retroactively validate a setoff made in violation of the automatic stay, even an innocent one, would ignore the order which section 553 seeks to place upon postpe-

tition setoff. The Debtor therefore has a $70,451.81 claim against First Union.

## VI. FIRST UNION'S PRESENT RIGHT OF SETOFF

The parties thus now have reciprocal claims. First Union has a $79,460.19 claim against the Debtor as a result of having paid check No. 2225 when the account had a zero balance. And, pursuant to this opinion, the Debtor has a $70,451.81 claim against First Union for First Union's improper setoff in that amount. Can First Union, with my authorization, set off its claim against the Debtor's claim? It can, provided the reciprocal claims both relate to the prepetition Debtor, so that they are mutual. If one claim springs from a transaction with the prepetition Debtor and the other from a transaction with the Debtor as debtor in possession, mutuality would be lacking because as debtor in possession the Debtor acts in a fiduciary capacity for the benefit of all creditors. Setoff would not then be permissible.[41]

As previously discussed, First Union's $79,460.19 claim against the Debtor is a prepetition claim because the postpetition payment of check No. 2225 merely made absolute the Debtor's prepetition contingent liability created when, prior to the filing,

36. *Operation Open City*, 170 B.R. 818.

37. *Miel*, 134 B.R. at 233; *OPM Leasing Servs.*, 40 B.R. at 403. *Cf. Mealey*, 16 B.R. at 802 (IRS held in contempt for postpetition setoff in violation of stay where it had knowledge of bankruptcy filing); *Nelson*, 6 B.R. at 251 (creditor with notice of filing held in contempt and setoff found void).

38. This case is quite different from *Weiss v. Azran (In re Thunderbolt Realty Trust)*, 190 B.R. 11 (Bankr.D.Mass.1996), where I granted retroactive relief from stay. There the stay violation was largely the result of the prosecution of an appeal by the debtor, so that estoppel applied. The appellate decision, moreover, provided a necessary adjudication and did not, as here, cause any loss of estate assets.

39. H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), U.S.Code Cong. & Admin.News, 1978, pp. 5787, 6296.

40. Section 553 provides in part:

(b)(1) Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(14), 365(h), 546(h), or 365(i)(2) of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—
(A) 90 days before the date of the filing of petition; and
(B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.
(2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.
11 U.S.C. § 553(b) (1988).

41. *E.g., Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030 (5th Cir.1987); *Cooper–Jarrett, Inc. v. Central Transp., Inc.*, 726 F.2d 93 (3d Cir.1984).

First Union missed its midnight deadline on the check. Less clear is the nature of the Debtor's $70,451.81 claim against First Union. That claim is the result of my voiding First Union's April 7th postpetition setoff. With the setoff voided, First Union's $70,-451.81 deposit liability to the Debtor comes back into existence. To the extent that liability was present on April 1st, the petition filing date, it is a prepetition liability. It is conceivable, however, that because of deposits after April 1st the account had a balance of less than $70,451.81 on the filing date. To the extent there was then a smaller balance, the difference may indicate the presence of a postpetition liability. I say "may" because postpetition liability would not be created by a postpetition deposit which is the result of action taken by the Debtor before the filing. For example, the Debtor may have mailed a deposit on March 31st which First Union credited to the account on April 2nd. I will therefore hold a further hearing on the matter.

A separate judgment has issued denying First Union's claim for the $59,745.83 payment, declaring its $70,451.81 setoff invalid and setting a hearing date to determine First Union's setoff rights.