**FEDERAL TRADE COMMISSION, et al., Plaintiffs,**

**v.**

**AMERICAN INSTITUTE FOR RESEARCH AND DEVELOP-MENT, et al., Defendants.**

**No. CIV. A. 97–30004–MAP.**

United States District Court, D. Massachusetts.

March 31, 1998.

---

640

Richard G. Pichette, Stephen J. Drohosky, Ardiff & Morse, P.C., Danvers, MA, for American Institute for Research and Development.

Peter W. Lamberton, Federal Trade Commission, Washington, DC, for Federal Trade Commission.

Lawrence G. Green, Perkins, Smith & Cohen, Boston, MA, for BayBank.

Steven N. Fox, Fox & Associates, Canton, OH, for Raymond R. Vieu, Frank J. Caso, Michael Carter, William R. Tourless.

Richard G. Pichette, Stephen J. Drohosky, Ardiff & Morse, P.C., Danvers, MA, for American Institute for Research and Development, John L. Samson.

Michael G. West, Shatz, Schwartz & Fentin, Boston, MA, for American Inventors Corporation, Ronald Boulerice.

John Hoime, Westfield, MA, pro se.

Michelle M. Loy, Alan C. Friedberg, Pendleton, Friedberg, Wilson & Hennessey, Denver, CO, for Cora Selig.

Joseph B. Collins, Hendel, Collins & Newton, Springfield, MA, for Joel Pelofsky, United States Trustee, Joseph B. Collins, Trustee.

## MEMORANDUM REGARDING FEDERAL TRADE COMMISSION'S MOTION TO WITHDRAW REFERENCE UNDER BANKRUPTCY RULE 5011(a), AND TO DISMISS THE INVOLUNTARY BANKRUPTCY PROCEEDING [1]
### (Docket No. 1)

PONSOR, District Judge.

### I. INTRODUCTION

The motion before the court arises in the midst of a legal traffic jam among a civil enforcement action brought by the Federal Trade Commission (FTC), related civil damage suits brought by private parties, pending bankruptcy proceedings, and an ongoing felony investigation. The facts are set forth in detail in the body of this memorandum but may be summarized by way of introduction as follows.

On October 24, 1996 this court issued an order in the civil enforcement action, *Federal Trade Commission v. American Inventors Corp.*, C.A. 95–30219–MAP (*FTC v. AIC*), requiring American Inventors Corporation (AIC) and its successor corporation, American Institute for Research and Development (AIRD), to reimburse a specifically identified group of individuals for losses incurred by these individuals as a result of violations by AIC and AIRD of a preliminary injunction previously issued by this court. This reimbursement was to take place within thirty days and was to be made from funds held in AIC and AIRD accounts at BayBank.

BayBank had, on three earlier occasions, attempted, unsuccessfully, to persuade this court not to order the reimbursement to the injured parties, on the ground that BayBank

itself had a superior claim to some or all of the money in the AIC and AIRD accounts.

On November 22, 1996, two days before the reimbursements were to be made from the BayBank accounts, BayBank (joined by four individuals) filed involuntary petitions under Chapter 7 of the Bankruptcy Code against AIC and AIRD, creating the cases now before the court. The effect of these filings has been to stay the distribution of funds from the BayBank accounts to the injured parties and thereby achieve an end run around the order BayBank had previously been unsuccessful in opposing in the *FTC v. AIC* case.

In the motions now before this court, the FTC has moved to withdraw the reference of these Chapter 7 petitions from the bankruptcy court and to dismiss them. BayBank and the other parties opposing these motions are correct that the FTC itself lacks standing to seek withdrawal and dismissal of the involuntary petitions. Nevertheless, this court will act *sua sponte* to withdraw the petitions and will dismiss them, based both upon the district court's general responsibility for superintendence of the bankruptcy court, and upon its duty to ensure that its remedial orders are not improperly undermined.

### II. PROCEDURAL AND FACTUAL BACKGROUND

Some years ago, BayBank, by its predecessor-in-interest, BayBank Valley Trust Co., entered into Credit Card Merchant Agreements with AIC and AIRD. Pursuant to these agreements, AIC and AIRD were allowed to place credit card transactions through BayBank. In return, AIC and AIRD agreed to reimburse BayBank for any amounts paid by BayBank to their credit card customers on account of any claim with respect to goods or services purchased from AIC or AIRD. BayBank alleges that, since AIC and AIRD ceased doing business, certain claims have been received from dissatisfied AIC and AIRD customers. BayBank further alleges that it has been required to honor the claims of these customers, making

---

1. An identical motion has been filed by the FTC in the case of *Federal Trade Commission v. American Inventors Corporation,* C.A. 97–30005–MAP.

This memorandum will address the motions in both cases.

payments in the amount of $44,591.25. To date, AIC and AIRD have failed to reimburse these payments to BayBank as required by the Credit Card Merchant Agreements. In the Chapter 7 filings submitted on November 22, 1996, BayBank asserts claims against AIC and AIRD for the money owed pursuant to these agreements.

In addition, two individuals (Caso and Vieu) have asserted claims against AIC, and two others (Carter and Tourless) have made claims against AIRD, for services paid for but not delivered. These four claimants are a fraction of the scores of customers who claim to have been defrauded by AIC or AIRD, many of whose claims are now also pending in separate private civil actions or are referred to in the pending *FTC v. AIC* case.

The AIC and AIRD Chapter 7 bankruptcy proceedings are closely entwined with the FTC enforcement action also pending before this court, *FTC v. AIC.* In order to understand the context of the issues now under consideration, it is necessary to review the background of that case in some detail.

On October 24, 1995 the FTC filed an action under section 13(b) of the Federal Trade Commission Act (the Act), 15 U.S.C. § 53(b), against AIRD, AIC and various individuals, alleging violations of § 5(a) of the Act. The two companies and their principals purported to offer services to individuals with patentable ideas, both in obtaining patents and in profitably exploiting their concepts. The FTC's complaint charged, in summary, that the companies and their principals defrauded large numbers of their customers, enticing them, for example, with representations that they accepted only a small percentage of the ideas submitted (when in fact they accepted as a customer virtually every individual who contacted them) and falsely representing that the patenting and promotion services offered by them would likely result in financial gain (when few customers ever received any gain, and none earned enough even to cover the money paid to the defendants). As a result of the defendants' conduct, hundreds of persons, according to the FTC, were duped into paying the

defendants thousands of dollars each for worthless or nonexistent patent and promotional services.

On October 25, 1995 this court issued an *ex parte* temporary restraining order barring AIC and AIRD from engaging in fraudulent conduct and freezing their assets. The asset freeze did not explicitly target BayBank, but it covered all AIC and AIRD bank accounts, including by clear implication those held by BayBank. Prior to the issuance of the asset freeze, BayBank had made no claim of entitlement to the AIC and AIRD funds held in its accounts.

On November 16, 1995, after a hearing with all parties represented, this court issued a lengthy preliminary injunction that continued the asset freeze, enjoined the fraudulent practices detailed in the FTC complaint and specified certain mandatory affirmative disclosures to be made by AIC and AIRD to future potential customers.

On November 21, 1995 the FTC moved for an Order to show cause why AIRD and its principal, John Samson, should not be held in civil contempt for violating the injunction by wrongfully diverting AIRD income to an entity under their control, United Patent and Trademark Services (UPTS), not subject to the asset freeze.[2] The court denied this motion on November 29, 1995, stating, "[t]he alleged misconduct does not appear to be sufficiently egregious to justify the sanction of contempt. Further misconduct may cross the line." Dkt. No. 46.

On December 28, 1995 the FTC filed a second, more serious, motion to show cause also against AIRD and Samson, charging, in essence, that the company and its principals had continued to "pitch" new customers using the same fraudulent enticements and without the required affirmative disclosures in flagrant violation of the court's injunction. Following a hearing, the court, on March 13, 1996, denied the motion "on condition that defendants comply with the revised preliminary injunction issued this day." Dkt. No. 58.

---

2. By this time AIC had ceased doing business.

This revised preliminary injunction of March 13, 1996 ordered AIC, AIRD and its principals to offer rescission of contracts and *full refunds* to every consumer who purchased services from AIRD or its alter-ego, UPTS, after November 15, 1995. The purpose of the revised preliminary injunction was clear: to make whole any individuals who had been induced to purchase services from the defendants by solicitations in violation of the court's October 25, 1995 TRO and its November 16, 1995 Preliminary Injunction. Without the commitment by AIRD and Samson to make the reimbursements, and their access to sufficient cash to do so, the court would have had to consider other remedial measures in response to the FTC's contempt motion. As it happened, the monies to make the required reimbursements lay in the AIC and AIRD accounts frozen at BayBank.

The case was thereafter set for trial to commence in June 1996. However, on March 25, 1996, following a report by the Assistant United States Attorney that an active criminal investigation was underway against the principals of AIC and AIRD, this court issued a stay of all proceedings in *FTC v. AIC*, out of concern that discovery in the civil enforcement case might jeopardize the targets' Fifth Amendment rights. In the weeks following March 25, 1996 counsel attempted to identify and agree upon both the persons to whom reimbursement was appropriate and the amounts to be returned under the terms of the revised preliminary injunction.

On June 17, 1996 BayBank filed a Motion to Intervene seeking relief from the stay and permission to exercise what it called its "right of set-off" against the frozen assets of AIC and AIRD held in the BayBank accounts. The motion was supported by the affidavit of a BayBank Vice President with hundreds of pages of documents attached. In its memorandum, BayBank argued that it was a "trustee" with a right to the funds superior to any other claimant as a matter of law. AIRD, Samson and the FTC filed memoranda vigorously contesting BayBank's motion and, particularly, its attempt to characterize itself as a "trustee" with a superior claim to the funds in its accounts. The court

carefully considered all these submissions and on June 25, 1996 denied BayBank's motion. As will be seen in the Discussion section of this memorandum below, BayBank's attempt here to impersonate a "trustee" is unpersuasive and contrary to the law as it applies in the circumstances of this case.

Also on June 25, 1996 AIRD and Samson filed a motion with the lengthy title, "Motion for an Order Authorizing Distribution of Frozen Funds to Reimburse Certain Individuals Who Made Payments to AIRD [or UPTS] Between October 25, 1995 and February 1, 1996, and Who Were Provided No or Incomplete Services in Return." The FTC assented to this motion, arguing only that the pool of individuals receiving refunds should be slightly larger than proposed, a minor disagreement that was later resolved.

On July 16, 1996 BayBank filed a Motion for Reconsideration of the Order Denying Intervention. Again, BayBank argued it possessed a superior right of set-off and needed to intervene to protects its interests. Samson and AIRD again responded, opposing the motion on the merits.

On August 21, 1996 a hearing was held on the Motion for an Order Authorizing Distribution, and the motion was allowed. BayBank was not present at the this hearing, but the court required counsel to submit a detailed proposed Order setting forth the specifics to govern distribution of the funds by September 23, 1996, with a copy to BayBank, and ordered that any objections to the distribution proposed be filed on or before October 7, 1996 by any party, including BayBank. Also on August 21, 1996 the court denied BayBank's Motion for Reconsideration of the Order Denying Intervention.

After a brief extension, the defendants and the FTC, on September 27, 1996, filed a Joint Motion for Entry of a Detailed Proposed Order Authorizing Distribution of Frozen Funds, along with a Proposed Order. On September 30, 1996 BayBank filed its Objection, asserting for the third time its previous argument that it was a "trustee" and therefore entitled to prioritized access to the funds at issue. This court again rejected that argument and, on October 24, 1996, allowed the Joint Motion and endorsed the order autho-

rizing distribution of the frozen funds, in thirty days, in the amount of slightly over $220,000.00.

At the risk of repetition, it is very important to highlight again the purpose and intent of this October 24, 1996 order.

The many individual former customers having claims against AIC, AIRD and their principals may be divided into two groups. One group comprises hundreds of people who claim to have been defrauded by these entities over the years, including, as noted above, the petitioners Carter, Tourless, Vieu and Caso. These persons charge that they paid large sums of money to obtain patents for their concepts and other services, received little or nothing in return and lost their money. In a nutshell, this group claims AIC and AIRD defrauded them with promises they could not, and never intended to, fulfill. AIC, AIRD and its principals *vigorously contest* these claims. They deny any intent to defraud or any other actionable misconduct.

The second, much smaller, group comprises a discrete number of individuals who submitted money to AIC or AIRD between October 25, 1995 and February 1, 1996. The FTC charges that these individuals were fraudulently "pitched" in violation of the court's TRO of October 25, 1995 and its November 16, 1995 preliminary injunction. In other words, the individuals in this second group never would have lost their money, *but for* the violation by AIC and AIRD of the court's orders during this specific period. AIC, AIRD and its principals, significantly, do *not* contest the entitlement of these individuals to reimbursement. They do not, of course, concede any wrongdoing. However, they do admit that they will not and cannot provide services to this group of customers, because the FTC's action has resulted in the collapse of their business. The defendants, from their point of view, simply lack the ability, as a practical matter, to deliver the services contracted for. Under these circumstances they agree these customers deserve their money back.

The court's order of October 24, 1996, therefore, was designed to provide a limited remedy solely for the individuals who were injured as a result of the violation of this court's earlier orders, by requiring the return of the funds that AIC, AIRD and UPTS should never have received in the first place and that they are indisputably not entitled to now.

Through manipulation of the bankruptcy process BayBank thwarted this limited remedial order. On November 22, 1996, two days before the distribution was to take place, BayBank and the four named individuals filed the involuntary Chapter 7 petitions against AIRD and AIC. Lawrence Green, counsel for BayBank, informed the FTC of this fact by letter stating that, because of the automatic stay, BayBank would not comply with the order of this court to release the funds. On December 9, 1997 the FTC filed a motion to withdraw and dismiss the bankruptcy petitions in the enforcement action, *FTC v. AIC.* This motion was subsequently denied on the ground that it was filed in the wrong case. On January 7, 1997 the FTC re-filed its motion as separate motions in the two Chapter 7 proceedings before the bankruptcy court. It is these two motions the court must now address.

### III.  JURISDICTION

Bankruptcy proceedings are within the original jurisdiction of the District Court. 28 U.S.C. § 1334 (1993). The district court has the power to refer, or to decline to refer, matters to the bankruptcy court. 28 U.S.C. § 157. Once referred to the bankruptcy court, the case may return to the District Court in one of two circumstances.

First, after a decision by the bankruptcy judge on a dispositive motion, litigants may appeal the bankruptcy court's judgment to a district court judge in much the same manner that appeals are taken from the district court to the Circuit Court of Appeals. Bankruptcy Rule 8001; *see also In re DN Associates,* 3 F.3d 512, 515 (1st Cir.1993).

Second, pursuant to Bankruptcy Rule 5011(a), a district court may, by allowing a motion to withdraw a reference, recapture a proceeding from the bankruptcy court. This case is now before the court on a motion by the FTC to withdraw the reference to the

bankruptcy court. As noted above, the court will allow the motion, acting *sua sponte.*

## IV. DISCUSSION

BayBank argues that the court has never afforded it a hearing on the merits of its substantive claim of entitlement to the AIC and AIRD funds in its accounts. The court's prior rulings in *FTC v. AIC* have already implicitly rejected this claim three times. Nevertheless, the court will begin this discussion by addressing the issue explicitly, concluding that BayBank's claim enjoys no priority over the court's revised preliminary injunction. Next, the court will take up the issue of the FTC's standing to seek withdrawal and dismissal of the bankruptcy petition. Finding that the FTC lacks standing, but that the court may act *sua sponte,* the court will then turn to the issue of withdrawal and dismissal on the merits.

### A. BayBank's Claim to the Funds

■ BayBank argues that, under the preliminary injunction, it is in the position of a trustee in a garden variety proceeding for attachment by trustee process. Given this status, BayBank asserts that it has a set-off right that takes priority over other creditors. *Grise v. White,* 351 Mass. 427, 430–31, 221 N.E.2d 874 (1966). It points out, correctly, that Massachusetts' trustee process law supports the principle that a trustee may deduct any amounts owed it from the trusted account. Mass. Gen. Laws Ann. ch. 246, § 26 (1988).

In response, the FTC asserts that after this court issued its revised injunction, the monies in the AIC and AIRD accounts at BayBank were held in constructive trust for possible return to eligible customers of AIC and AIRD.

A constructive trust may be said to be a device employed in equity, in the absence of any intention of the parties to create a trust, in order to avoid the unjust enrichment of one party at the expense of the other where the legal title to the property was obtained by fraud or in violation of a fiduciary relation or where information confidentially given or acquired was used to the advantage, of the recipient at the

expense of the one who disclosed the information.

*Massachusetts Wholesalers of Malt Beverages, Inc. v. Attorney General,* 409 Mass. 336, 342, 567 N.E.2d 183 (1991) (quoting *Barry v. Covich,* 332 Mass. 338, 342, 124 N.E.2d 921 (1955)).

Under this theory, BayBank does not have a right that defeats this court's revised preliminary injunction. Rather, it has the obligation to hold the funds in the AIC and AIRD accounts for distribution to the persons wronged by the violations of the court's orders.

Unfortunately, the facts of this case do not fall comfortably into either a constructive trust or trustee process theory. No motion for an attachment by trustee process was ever filed. The court merely froze the assets of AIC, AIRD and the individual defendants, without knowledge of where these assets lay, and left responsibility for notice to the FTC. Although the court's order had some of the same effects as an attachment by trustee process, it was not a traditional trustee process action, and Massachusetts case law in this area does not fit these facts. The Bay-Bank funds were not held, as in the tort context, to ensure payment of an ultimate judgment, but were frozen based upon a strong preliminary showing that they had been obtained originally through violations of federal laws designed to protect consumers. In other words, the court was not simply securing a fund rightly belonging to the defendants in order to ensure that a likely ultimate judgment would be paid, as in the typical tort context. On the contrary, the court was seizing funds that it had found, based on the FTC's preliminary showing, the defendants were probably *never* entitled to in the first place. Under these circumstances, it makes no sense to give the entity that happens to have physical possession of the improperly obtained funds first crack at them.

At the same time, a constructive trust theory fits these facts awkwardly as well. BayBank was not in any sense a wrongdoer against whom the court could exercise its equitable powers. *In re Monarch Capital*

*Corp.,* 130 B.R. 368, 376 (Bankr.D.Mass.1991) ("[a] constructive trust is a remedial device designed to prevent unjust enrichment." (citations omitted)). Although a constructive trust may be imposed in certain rare circumstances where no wrongdoing is shown, for example, where a unilateral mistake has been made, this is not such a circumstance. *See, e.g., In re Abbey Financial Corp.,* 193 B.R. 89, 92–93 & n. 2 (Bankr.D.Mass.1996) (recognizing that bankruptcy courts have imposed a constructive trust in circumstances where, without wrongdoing, mistakes occurred).

The facts of this case fall most aptly under the authorities covering funds set aside for a special purpose. Without relying on a theory of constructive trust, these cases demonstrate that BayBank has no right of set-off.

■ Under Massachusetts law, there are three prerequisites to the exercise of a right of set-off. First, the funds deposited into the account at issue must be unrestricted. Second, a mutual obligation must exist between the bank and creditor. Finally, the debt the bank seeks to set-off must be due and payable. *Spencer Cos., Inc. v. Chase Manhattan Bank, N.A.,* 81 B.R. 194, 197 (D.Mass.1987) (citing Norton & Whitley, Banking Law Manual § 11.05[2] (1987)). Here, from the moment the court issued its preliminary injunction, the funds held by BayBank were *not* "unrestricted". Instead, the funds in the frozen BayBank account became, in effect, dedicated to a special purpose by operation of the injunction; they were to be held for return to the persons from whom they had been wrongfully taken. Once dedicated to a special purpose, under Massachusetts law, BayBank could not exercise a set-off against this deposit. *In re Saugus General Hosp., Inc.,* 698 F.2d 42, 46 (1st Cir.1983); *In re Milano Textiles, Inc.,* 38 B.R. 964, 966 (Bankr.D.Mass.1984).

Under the terms of the preliminary injunction the depositors (AIC, AIRD or its principals) were prevented from withdrawing funds except to pay certain allowed expenses. This fact also tends to support the notion that the AIC and AIRD accounts were being held for a special purpose. *Milano Textiles,* 38 B.R. at 966 (citing *Constructora Maza, Inc. v. Banco de Ponce,* 616 F.2d 573 (1st Cir.1980)) ("One characteristic that has been recognized as distinguishing a special purpose or restricted depository account from a 'general deposit' is the absence of the depositor's ability to withdraw the funds at will."). Further, BayBank had notice that the accounts were dedicated to a special purpose *before* it asserted any claim to the funds. In fact, it was only subsequent to the court's injunction and asset freeze order that Bay-Bank filed its motion to intervene, asserting a claim to the funds.

Finally, given the circumstances of this case, to allow BayBank a right of set-off would be to undermine the integrity of the court's power to grant effective preliminary relief. *Milano Textiles,* 38 B.R. at 967 (where a court ordered funds to be held in escrow pending further order of the court, finding that the funds were not dedicated to a special purpose would undermine the integrity of the court). This consideration is especially compelling where the distribution order arose in the context of a motion for contempt and where reimbursement was ordered as an alternative to other harsher potential sanctions.

In sum, BayBank had no valid right of set-off against the AIC and AIRD accounts once the court made a preliminary finding that these monies had been obtained in violation of federal law and were to be held for further action by the court. To permit intervention in an already over-complicated case, in order to allow assertion of a doomed claim, made no sense. It is for these reasons that Bay-Bank's motion to intervene, its motion to reconsider intervention, and its objection to the distribution of funds were all denied in the *FTC v. AIC* enforcement action.

**B. *Standing of The Federal Trade Commission***

■ As noted, the motion to withdraw the reference and to dismiss has been submitted by the FTC under Bankruptcy Rule 5011(a). The FTC, however, is not a party to the involuntary bankruptcy proceeding. Under Bankruptcy rule 1011(a), only a debtor named in the petition may contest the proceeding. *See also,* 9 Collier on Bankruptcy

¶ 1011.02 (15th ed.1996). Therefore, the FTC lacks standing to bring this motion. AIC and AIRD, the targets of the involuntary petitions, would have standing to file the motions, but have declined to appear in the bankruptcy action, perhaps due to concerns about the pending criminal investigation. The FTC's motion is, therefore, not properly before this court.

### C. The Court's Power To Act Sua Sponte

Under the Bankruptcy Rules, a district court may "withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d). Although the statute does not define "cause," it is generally recognized that the "goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process" are among the factors the district court should consider. *In re Dooley Plastic Co., Inc.*, 182 B.R. 73, 80 (D.Mass.1994) (quoting *In re United States v. Kaplan*, 146 B.R. 500, 504 (D.Mass.1992)); *see also, In re Pruitt*, 910 F.2d 1160, 1168 (3d Cir.1990); *Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 999 (5th Cir.1985).

After considering the above factors, the court will act on its own motion and order withdrawal of the bankruptcy petition. It is true, as counsel for BayBank and the four individual claimants point out, that withdrawal of a reference is to be reserved for an unusual circumstance. But the situation here clearly qualifies. The "traffic jam" of colliding legal activity described in the Introduction to this memorandum calls for one traffic cop, and this court is in the best position to sort out the parties and, so to speak, get them through the intersection. Moreover, one effect of the withdrawal of the petition will be to permit this court to pre-vent BayBank from manipulating the bankruptcy process to interfere with this court's oversight of the *FTC v. AIC* litigation. This action is permitted by the Code. *See* 11 U.S.C. § 105(a) ("No provision of this title ... shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."). *See also, Congress Credit Corp. v. AJC Int'l, Inc.*, 42 F.3d 686, 691 (1st Cir.1994) ("bringing the preference claims into the district court will allow all facets of these controversies affecting the same property and the same defendants to be disposed of by one tribunal having undoubted jurisdiction and authority.").

### D. Dismissal of the Involuntary Bankruptcy Proceeding

The FTC argues that this court should dismiss the petitions pursuant to 11 U.S.C. § 303(b)[3] because four of the petitioning creditors have claims that are both contingent and subject to a bona fide dispute. If the FTC is correct, then only one valid petitioner, BayBank, would remain on each petition. In this event, dismissal of the petitions would be appropriate, since 11 U.S.C. § 303(b) requires that an involuntary petition under chapter 7 or 11 be supported by three or more entities.

The FTC contends that the four individual creditors' claims are contingent because the essence of their charges against AIC and AIRD is that these entities committed the tort of fraud by luring them into purchasing the companies' worthless services. *In re Turner*, 32 B.R. 244 (Bankr.D.Mass.1983). Since there has never been, and may never be, a finding of liability on these causes of action, they are contingent. Further, the FTC asserts that the individual creditors' claims are subject to a bona fide dispute both legally and factually.

---

**3.** 11 U.S.C. § 303(b) provides, in relevant part:

An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute....

*Id.*

The FTC appears to be correct that the claims of the four individual petitioners are contingent, as a matter of law. In *In re Turner*, the judge held that "the clear weight of authority holds that tort claims are contingent since they are dependent upon a judicial finding of liability against the alleged tortfeasor." *Id.* at 249.

It is not enough to respond that the petitioners have asserted breach of contract as an alternate theory of recovery. The fact remains that the validity of their claims is contingent upon the occurrence of a future event. In addition, in the circumstances of this case—particularly the existence of a pending felony investigation—the absence of a formal appearance and denial by AIC and AIRD in the response to the petitions cannot be construed as conclusive on the issue of liability.

Given the contingent nature of the claims offered by three of the four entities, the risk of abuse of the bankruptcy system and the interest of the court in vindicating its remedial orders, this case presents an appropriate occasion for the court's exercise of discretion to dismiss the bankruptcy petitions pursuant to 11 U.S.C. § 305(a), the abstention provision. Section 305(a) provides:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
>
> (1) the interests of creditors and the debtor would be better served by such dismissal or suspension ....

Counsel have obviously been given the required prior notice and opportunity to be heard regarding this dismissal. Therefore, pursuant to 11 U.S.C. § 305(c), the court's action is not reviewable. 11 U.S.C. § 305(c). The use of this provision for a *sua sponte* dismissal is appropriate. *In re Harvey Probber, Inc.*, 44 B.R. 647, 652 (Bankr. D.Mass.1984).

## V. CONCLUSION

For the foregoing reasons, the FTC's motion to withdraw the reference and dismiss the involuntary bankruptcy proceeding is hereby **DENIED**. However, the court, acting on its own power *sua sponte*, hereby orders that these proceedings be withdrawn and the petitions be **DISMISSED**.